# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

September Term, 2012
_____

No. 13-7024
_____

GREENSPRING FINANCIAL INSURANCE LIMITED, INC.

Appellant,

v.

INTERSTATE FIRE AND CASUALTY COMPANY

Appellee.

_____

Appeal from the United States District Court for the District of Columbia
1:10-cv-01193-ABJ
_____

**BRIEF OF APPELLANT**

_____

Linda S. Woolf, Esq. (#54132)
lsw@gdldlaw.com
Joseph B. Wolf, Esq. (#54892)
jbw@gdldlaw.com
Goodell, DeVries, Leech & Dann, LLP
One South Street, 20th Floor
Baltimore, Maryland 21202
(410) 783-4000
(410) 783-4040 (Facsimile)

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

## PARTIES

The parties before the Court in this matter are Appellant, Greenspring Financial Insurance Limited, Inc. ("Greenspring") and Appellee, Interstate Fire and Casualty Co. ("Interstate"). The parties before the district court were Greenspring, Interstate, MedStar Health, Inc. and Washington Hospital Center. There were no *amici* in the district court. Greenspring is unaware of any *amici* before this Court.

Greenspring is a captive insurer, and a wholly-owned subsidiary, of MedStar Health, Inc. Neither Greenspring's parent company, nor any of its subsidiaries or affiliates, has any outstanding securities in the hands of the public.

## RULINGS

Appellant seeks review of the March 28, 2012 Order and January 18, 2013 Order and Judgment of Judge Amy Berman Jackson in the United States District Court for the District of Columbia. Copies of those Orders and the Memorandum Opinions associated with those Orders are reproduced at J.A. 647-667, J.A. 942-954.

## RELATED CASES

This case was not previously before this Court or any other appellate court.

i

## TABLE OF CONTENTS

CERTIFICATE OF PARTIES, RULINGS UNDER REVIEW,
AND RELATED CASES ............................................................................. i

TABLE OF CONTENTS ............................................................................ ii

TABLE OF AUTHORITIES ..................................................................... iv

JURISDICTIONAL STATEMENT .............................................................. 1

STATEMENT OF THE ISSUES ON APPEAL .......................................... 2

STATEMENT OF THE FACTS ................................................................. 3

SUMMARY OF ARGUMENT .................................................................. 11

STANDARD OF REVIEW ....................................................................... 14

ARGUMENT ........................................................................................... 15

I.    Nurse Hand Was Not Covered By the Greenspring Policy
       Because She Was Not a Full-Time or Part-Time Employee
       of the Hospital ................................................................................ 15

       A.    The District Court Erred by Applying the Common
              Law Master-Servant Test Instead of Analyzing the
              Ordinary, Common, Popular Meaning of the Words
              "Full-Time" and "Part-Time" in the Greenspring Policy's
              Definition of "Employee" ....................................................... 16

       B.    Even if the Meaning of "Employee" in the Greenspring
              Policy Could be Disputed or if the District Court was
              Correct That the Greenspring Policy's Definition of
              "Employee" was Unclear, The District Court Erred By
              Failing to Consider the Reasonable Expectations of the
              Parties to the Greenspring Policy and Instead Applying

the Common Law Master-Servant Test....................................23

II.    Even if Nurse Hand Was An Employee Under the
Greenspring Policy, the District Court Erred by
Determining the Obligations of the Insurers Based
Upon the "Other Insurance" Clauses Instead of
the Indemnification Provision of the Staffing Agreement ................27

III.   The District Court Erred When It Granted Interstate
Summary Judgment as to Its Equitable Claim for Contribution
Because the Equities Favor Greenspring, Not Interstate....................38

IV.    The District Court Erred When It Held that Greenspring
Was Obligated to Indemnify Interstate for the Full Amount
It Paid to Settle the Bank's Action Because it Failed to Account for
the Hospital's Release of its Contractual Indemnity Claim
Against Progressive ........................................................................41

CONCLUSION ............................................................................47

CERTIFICATE OF COMPLIANCE ...........................................48

CERTIFICATE OF SERVICE....................................................48

# TABLE OF AUTHORITIES

## Cases

*Aetna Ins. Co. v. Fidelity & Cas. Co. of New York,* 483 F.2d 471
(5th Cir. 1973) ......................................................................32

*A.I. Trade Fin., Inc. v. Petra Int'l Banking Corp.*, 62 F.3d 1454,
1458 (D.C. Cir. 1995 .............................................................15

*American Fidelity & Casualty Company v. Simmons*, 253 F.2d 634
(4th Cir. 1958) ...............................................................31, 32

*Am. Indem. Lloyds  v. Travelers Prop. & Cas. Ins. Co.*, 335 F.3d 429,
436 (5th Cir. 2003 ............................................................... 31

*Am. Underwriters, Inc. v. Auto-Owners Mut. Ins. Co.,* 454 N.E. 2d
876, 877 (Ind. Ct. App. 1983 .................................................34

*Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 576 (D.C. Cir. 2013) .................14

*Basch v. George Washington Univ.*, 370 A.2d 1364, 1367
(D.C. 1977)............................................................................17

*Berkeley v. Fireman's Fund Ins. Co.,* 407 F. Supp. 960, 969
(W.D. Wash. 1975).................................................................31

*Boggs v. Motors Ins. Corp.*, 139 A.2d 733, 735 (D.C. 1958).......................17

*\*Cameron v. USAA Prop. & Cas. Co.*, 733 A.2d 965, 968
(D.C. 1999)......................................................................17, 18

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ...................................45

*\*Chase v. State Farm Fire & Cas. Co.*, 780 A.2d 1123, 1127
(D.C. 2001)............................................................................17

Authorities upon which we chiefly rely are marked with asterisks.

*Chubb Ins. Co. of Canada v. Mid-Continent Cas. Co.,* 982 F. Supp. 435 (S.D. Miss. 1997).............................................................................33

*Clougherty Packing Co. v. C.I.R.*, 811 F.2d 1297, n.1 (9th Cir. 1987)..........24

*\*Dist. of Columbia v. C.J. Langenfelder & Son, Inc.,* 558 A.2d 1155, 1159 (D.C. 1989) .................................................................................23

*Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)................................................................................15

*Evans v. Medical Inter- Ins. Exch.*, 856 A.2d 609 (D.C. 2004)....................20

*Fithian v. Jamar,* 286 Md. 161, 169–70, 410 A.2d 569, 573–74 (1979) ...........................................................................................39

*\*Green Leaves Rest., Inc. v. 617 H St. Associates*, 974 A.2d 222, 239 (D.C. 2009).................................................................................39

*Group Hospitalization, Inc. v. Foley,* 255 A.2d 499, 500-01 (D.C. 1969) ......................................................................................20

*Intercounty Constr. Corp. v. District of Columbia,* 443 A.2d 29, 32 (D.C.1982) ........................................................................................23

*Interstate Fire & Cas. Co. v. Auto-Owners Ins. Co.,* 433 N.W.2d 82 (Minn. 1988)......................................................................................34, 35

*J. Walters Constr., Inc. v. Gilman Paper Co.,* 620 So.2d 219, 221 (Fla. Dist. Ct. App. 1993)..........................................................................34

*\*Kakaes v. George Washington Univ.*, 683 A.2d 128, 132 (D.C. 1996)...........................................................................................17

*Key Const., Inc. v. Colony Ins. Co.*, No. 3-10-CV-0297-BD 2011 WL 2728138 (N.D. Tex. July 13, 2011) ...........................................22

*Maxum Indem. Co. v. New Jersey Iron, Inc.*, Civ. No. 09-6397 2010 WL 4853644 (D.N.J. Nov. 22, 2010) ................................................22

*Med. Serv. of D.C. v. Llewellyn*, 208 A.2d 734, 736 (D.C. 1965) ................17

*Mendenhall v. Prop. & Cas. Ins. Co. of Hartford*, 375 S.W.3d 90,
91-92 (Mo. 2012)......................................................................................22

*Merchants Mutual Insurance Co. v. Richardson,* 273 A.2d 652,
655 & n. 5 (D.C.App.1971).......................................................................39

*Nationwide Prop. & Cas. Ins. Co. v. Brinley's Grading Serv., Inc.*,
737 S.E.2d 192 (N.C. Ct. App. 2013).........................................................22

*Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Zurich Ins. Co.*,
2011 WL 1103475, at *3 (N.J. Super. Ct. App. Div. Mar. 28, 2011)...........22

*Ottenstein v. Julius Garfinkel & Co.,* 151 A.2d 925, 927
(D.C.Mun.App.1959)................................................................................39

*Pac. Plumbing & Heating Co. v. Aetna Cas. & Sur. Co.,* C 93-20561
 RMW 1995 WL 232396, *9 (N.D. Cal. Apr. 13, 1995)..............................34

*\*Pleasants v. Loc*ke, 924 F.2d 1144, 1146 (D.C. Cir. 1991) .......................39

*Quadrangle Develop. Corp. v. Hartford Ins. Co.*, 645 A.2d 1074, 1075
(D.C. 1994)...............................................................................................17

*Reliance Group Holdings, Inc. v. Nat'l Union Fire Ins. Co.,*
188 A.D.2d 47, 594 N.Y.S.2d 20, 26 (N.Y.App.Div.1993).........................39

*Robinson v. Aetna Life Ins. Co.,* 288 A. 2d 236, 238 (D.C. 1972) ...............20

*Rossmoor Sanitation, Inc. v. Pylon, Inc.,* 119 Cal. Rptr.
449 (1975) ...........................................................................................33, 34

*Stewart v. St. Elizabeth's Hospital,* 589 F.3d 1305, 1307
(D.C. Cir. 2010).........................................................................................14

*St. Paul Fire & Marine Ins. Co. v. Am. Int'l Specialty Lines Ins. Co.*,
365 F.3d 263, 270-71 (4th Cir. 2004).........................................................30

*St. Paul Fire & Marine Insurance Co. v. Lexington Ins. Co.*,
No. 05-80230-Civ. 2006 WL 1295408, *at 5
(S.D. Fla. April 4, 2006) ...........................................................................31

*Travelers Indem. Co. of Illinois v. United Food & Commercial
Workers Int'l Union*, 770 A.2d 978, 986 (D.C. 2001)..................................36

*Travelers Property Casualty Company of America v.
Liberty Mutual Insurance Company*, 444 F.3d 217
(4th Cir. 2006) .........................................................................................24

*United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993,
8 L.Ed.2d 176 (1962) ...............................................................................14

*United States Fid. & Guar. Co. v. Aetna Cas. & Sur. Co.,* 418 F.2d
953, 956 (8th Cir. 1969)...........................................................................34

*\*Wal–Mart Stores, Inc. v. RLI Ins. Co.,* 292 F.3d 583, 588
(8th Cir. 2002) ....................................................................................28, 30

*Wellington Specialty Ins. Co. v. Kendall Crane Serv.*, 434 F. App'x 794,
796 (11th Cir. 2011)..................................................................................22

*\*Whiting v. AARP*, 637 F.3d 355, 361 (D.C. Cir. 2011) ............................24

## Rules

28 U.S.C. § 1291........................................................................................2

28 U.S.C. § 1332........................................................................................1

## Treatises

Lee R. Russ & Thomas F. Segalla, 15 *Couch on Insurance,*
 § 219:1, at 219–7 (3d ed.1999) ..................................................................20

2 Williston on Contracts § 345 (3d ed. 1959)...............................................20

## JURISDICTIONAL STATEMENT

Appellee, Interstate Fire & Casualty Company ("Interstate'), filed this action against Appellant, Greenspring Financial Insurance Limited ("Greenspring"), Washington Hospital Center (the "Hospital") and MedStar Health, Inc. ("MedStar"), Greenspring's and the Hospital's parent corporation, in the United States District Court for the District of Columbia. Jurisdiction was proper in the district court pursuant to 28 U.S.C. § 1332 because Interstate and the defendants were at all relevant times of diverse citizenship and the amount in controversy exceeded $75,000. (J.A. 16).

In a Memorandum Opinion and Order dated March 28, 2012, the district court (per Jackson, J.) granted MedStar's and the Hospital's motion for summary judgment, denied Greenspring's motion for summary judgment, and granted Interstate's motion for partial summary judgment as to liability only. (J.A. 647-666). Thus, only Greenspring and Interstate remained as parties in the district court action.

The district court then referred the issue of damages to Magistrate Judge Kay. (J.A. 699). Following briefing by the parties as to damages, Magistrate Judge Kay issued a Memorandum Order on September 4, 2012 finding that Interstate was entitled to $3,208,248.72 in damages plus prejudgment interest. (J.A. 926-938). Greenspring filed objections to Magistrate Judge Kay's Opinion,

to which Interstate responded. (J.A. 13). On January 18, 2013, the district court issued a memorandum opinion adopting Judge Kay's findings. (J.A. 944-954). The district court also issued an Order and Judgment awarding Interstate $3,208,248.72 in damages plus prejudgment interest. (J.A. 942-943). The January 18, 2013 Order and Judgment constituted a final order because it disposed of all claims in the action.

On February 14, 2013, Greenspring timely filed a notice of appeal with the district court. (J.A. 955).

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291, which provides that "[t]he courts of appeal … shall have jurisdiction of appeals from all final decisions of the district courts of the United States[.]"

## STATEMENT OF THE ISSUES ON APPEAL

1. Did the district court err when it ignored the common, ordinary, popular meaning of the words in the Greenspring Policy's definition of "employee" and instead applied the common law master-servant test to conclude that Nurse Hand was covered under the Greenspring Policy as an employee of the Hospital?

2. Did the district court err in finding that the "other insurance" clauses in the insurance policies issued to the Hospital and Nurse Hand's employer took precedence over the indemnity provision in the Staffing Agreement between the

2

Hospital and Progressive?

3.    Did the district court err in finding in favor of Interstate on its claim for contribution where it failed to recognize that the equities favor a finding that Interstate, not Greenspring, owed Nurse Hand coverage?

4.    Did the district court err in awarding Interstate the full amount it paid on behalf of Nurse Hand and Progressive to settle the Banks Action where it failed to recognize that a portion of the money paid by Interstate to settle the Banks Action was to obtain a release of the Hospital's indemnity claims against Progressive?

## STATEMENT OF THE FACTS

### I.    The Staffing Agreement

On or about February 22, 2002, the Hospital and Progressive entered into an agreement (the "Staffing Agreement") pursuant to which Progressive agreed to provide the Hospital with temporary nurses from its roster of registered nurse employees. (J.A. 47-60).

Pursuant to the Staffing Agreement, Progressive provided its registered nurse employees to the Hospital on a per diem basis, which applied to "temporary staffing needs of short duration, *e.g.*, from one shift up to potentially several weeks of work[.]"  (J.A. 50).  The Staffing Agreement specifically and unambiguously stated that when working for the Hospital, Progressive's registered nurse

3

employees were the employees of Progressive as follows:

### ARTICLE II: Responsibilities of PROGRESSIVE

A. All Registered Nurses assigned to HOSPITAL are employees of PROGRESSIVE and will remain so unless hired by HOSPITAL as outlined in Article X.B, below.

(J.A. 47).

The Hospital and Progressive also agreed to a clearly delineated contractual risk allocation. Pursuant to the Staffing Agreement, Progressive was obligated to indemnify the Hospital for claims arising from the negligence of Progressive or its registered nurse employees who were provided to the Hospital. (J.A. 53).

The Hospital and Progressive also agreed that the responsibility for purchasing and maintaining professional liability insurance covering Progressive's registered nurse employees provided to the Hospital was placed squarely on Progressive. *Id.* The Hospital was under no obligation to maintain professional liability insurance covering Progressive's registered nurse employees, nor did it agree to do so.

The Hospital maintained clear distinctions between its full-time and part-time nurse employees and Progressive's registered nurse employees who worked at the Hospital in and around April 2004. The Hospital's employee nurses were all required to be union members, while agency nurses, such as Progressive's

employees, were not.  Thus, the Hospital's relationship with its nurse employees was governed by a collective bargaining agreement, while its relationship with Progressive's nurse employees was not.  (J.A. 548).

The Hospital's full-time and part-time nurses were required to sign offer letters attesting to the fact that they had accepted employment with the Hospital. (J.A. 556).  Agency nurses, including those supplied by Progressive, neither received nor signed such offer letters. (J.A. 557).  The Hospitals' employee nurses were provided with the Hospital's employee handbook and were required to sign an acknowledgement that they received it.  (J.A. 556).  Agency nurses, such as those provided by Progressive, did not receive the employee handbook.  *Id*.  The Hospital's orientation for agency nurses was different from the orientation it provided to its employee nurses.  (J.A.548).

Whereas the Hospital verified the licensure and other qualifications of its employees and maintained copies of the documentation required by government agencies that oversee hospitals and nurses, it did not do so with regard to Progressive's registered nurse employees.  Rather, as required by the Staffing Agreement, Progressive took on and carried out those responsibilities with regard to its registered nurse employees.  (J.A. 47).

The Hospital did not verify that Progressive's registered nurse employees were physically able to perform their nursing duties or that they had received

5

required immunizations. Rather, as required by the Staffing Agreement, Progressive took on and carried out those responsibilities with regard to its nurse employees. *Id.* The Hospital did not perform drug testing or conduct criminal background checks of Progressive's registered nurse employees. Instead, as required by the Staffing Agreement, Progressive took on and carried out those responsibilities. *Id.*

## II. The Insurance Policies

Greenspring issued a Primary Healthcare Providers Professional and General Liability, Managed Care Errors and Omissions and Employment Practices Liability Policy of Indemnification to MedStar, the parent company of the Hospital, bearing policy no. 1-12704-00-03 with effective dates of July 1, 2003 – July 1, 2004 (the "Greenspring Policy") (J.A. 382-426). Pursuant to an endorsement to the Greenspring Policy, the Hospital was also an insured under the Greenspring Policy.

The Greenspring Policy defined "Employee" as follows:

> *Employee(s)* means all past, present, or future full-time or part-time *Employees* of the *Named Insured* including subsidiaries of the *Named Insured*.

(J.A. 516).

Pursuant to the "Other Insurance" clause of the Greenspring Policy, the Greenspring Policy was deemed to provide primary coverage to "*Employees.*" (J.A. 518).

Interstate issued a primary claims-made healthcare professional liability insurance policy to Progressive. (J.A. 429-452). It is undisputed that both Nurse Hand and Progressive were covered under the Interstate Policy for claims against Nurse Hand arising from her work at the Hospital.

In contrast to the Greenspring Policy, which only covered full-time and part-time employees of its named insureds, the Interstate Policy contained broad language that brought employees of all types within its coverage, stating that it covered:

> Any current or former employee of the **Named Insured**, but only while such employee is or was…acting on behalf of the **Named Insured**, and only within the employee's duties as such…

(J.A. 444-45).

The Interstate Policy also included the following language related to insured contracts:

> This insurance shall not apply…to liability assumed by any **Insured** under any contract or agreement, except to the extent the **Insured** would be liable in the absence of such contract or agreement.

(J.A. 446).

The Interstate Policy also included the following "other insurance" provision:

X.     CONDITIONS

D.     OTHER INSURANCE
If there is other valid insurance (whether primary,

7

excess, contingent or self-insurance) which may apply against a loss or claim covered by this policy, the insurance provided hereunder shall be deemed excess insurance over and above the applicable limit of all other insurance or self-insurance.

When this insurance is excess, the Company shall have no duty under this policy to defend any Claim or Suit that any other insurer or self-insurer has a duty to defend.  If such other insurer or self-insurer refuses to defend such Claim or suit, the Company shall be entitled to the insured's right against all such other insurers or self-insurers for any Claims Expenses incurred by the Company.

When both this insurance and other insurance or self-insurance apply to the loss on the same basis, whether primary, excess or contingent, the Company shall not be liable under this policy for a greater proportion of the loss or defense costs than the applicable limit of liability under this policy for such loss bears to the total applicable limit of liability of all valid and collectible and collectible insurance against such loss.  Subject to the foregoing, if a loss occurs involving two or more policies, each of which provides that its insurance shall be excess, each will contribute pro rata.

(J.A. 450).

### III.    The Banks Tort Action and the Settlement Agreement and Release that Resolved It

In or around April 2004, Chichio Hand, a registered nurse, was employed by Progressive.  (J.A. 572).  On or around April 6, 2004, Progressive provided Nurse Hand to the Hospital as a per diem nurse as described in the Staffing Agreement.  (J.A. 44).  While working at the Hospital as a Progressive per diem nurse on that date, Nurse Hand was involved in the post-partum/post-operative care of Radianne

8

Banks, who delivered a baby by cesarean section. (J.A. 18). Following delivery of her baby, Ms. Banks was unable to move her legs. *Id*. A subsequent MRI revealed that Ms. Banks sustained a thoracic cord infarct. *Id*.

As a result of the injuries she suffered, Radianne Banks filed a lawsuit against the Hospital and two physicians styled <u>Radianne Banks v. Washington Hospital Center Corporation, et al.</u>, Case No. 2002 CA 002022M in the Superior Court for the District of Columbia (the "Banks Action"). The Hospital then filed a third-party complaint against Progressive and Nurse Hand that included claims for common law indemnity, contractual indemnity based upon the indemnity obligation in the Staffing Agreement, and contribution. (J.A. 353-360). The claims in the third-party complaint were based, in part, upon Nurse Hand's status as an employee of Progressive. (J.A. 355). In their answer to the third-party complaint, Progressive and Nurse Hand admitted that, at all relevant times, Nurse Hand was an employee of Progressive. (J.A. 560). Interstate provided Progressive and Nurse Hand with a defense in the third-party action brought by the Hospital. Later, Ms. Banks amended her complaint to add Nurse Hand and Progressive as Defendants.

Ultimately, the parties reached a settlement that resolved the claims in the Banks Action, which was memorialized in a Settlement Agreement and Release (the "Settlement Agreement"). (J.A. 367-378). Pursuant to the Settlement

9

Agreement, Interstate paid $3,055,000 "on behalf of the individuals and entities qualifying as insureds under its policies" (*i.e.*, Nurse Hand and Progressive), and the Hospital paid $1,050,000. (J.A. 369). In exchange for Interstate's paying the lion's share of the settlement, the Hospital released its common law claims against Nurse Hand, and both its common law and contractual indemnity claims against Progressive. (J.A. 368) ("This release shall extend to every type of claim, whether based on a tort, contract or other theory of recovery, including but not limited to the Temporary Staffing Agreement."). The Settlement Agreement also included the following terms: (1) Ms. Banks released her claims against all parties to the Banks Action; (2) Greenspring and MedStar released all of their claims against Progressive, Nurse Hand and Interstate; (4) Progressive and Nurse Hand released all claims against the Hospital and MedStar; and (5) Interstate released its claims against Greenspring, MedStar and the Hospital subject to the following carve-out:

> Nothing contained in this Agreement should be construed as a waiver of [Interstate's] rights under its policies to seek reallocation of the settlement. The Hospital agrees and understands that [Interstate] does not waive and expressly reserves the right to rely on the "other insurance" clauses incorporated into its policies to seek reallocation of the settlement as may be warranted.

(J. A. 369).

Thus, Interstate reserved the right to seek reallocation of the settlement based upon the applicability of the "other insurance" clauses to the coverage

obligations of Greenspring and Interstate to the claims in the Banks Action.

## SUMMARY OF ARGUMENT

Progressive purchased the Interstate Policy to cover it and its registered nurse employees, including Nurse Hand, against claims arising from their work at the hospitals to which they were assigned.  By so doing, Progressive complied with its contractual obligation to the Hospital to provide coverage for the registered nurse employees it leased to the Hospital.  Yet, when the Hospital, and later Ms. Banks, sued Progressive and Nurse Hand for injuries Ms. Banks suffered due to the negligence of Nurse Hand, Interstate insisted that the Hospital's insurer, Greenspring, was obligated to cover Nurse Hand.  Interstate sought to saddle Greenspring with the full cost of the settlement that the parties reached among themselves and with Ms. Banks despite the unequivocal agreement between the Hospital and Progressive that Progressive's insurer would cover Nurse Hand for these claims and the fact that Progressive was obligated to indemnify the Hospital for such claims.

Interstate's attempt to shoehorn Nurse Hand into coverage under the Greenspring Policy, which was erroneously embraced by the district court, is premised entirely on Interstate's self-serving and incorrect reading of the Greenspring Policy's definition of "employee," which  ignores the policy's plain terms.  Only full-time or part-time employees of MedStar or its subsidiaries are

11

included in the Greenspring Policy's definition of "employee." The definition, notably, does not include temporary, per-diem workers like Nurse Hand who are assigned to the Hospital by staffing agencies like Progressive on a shift-by-shift, as-needed basis and who are hired, screened and paid by such agencies. Interstate did not argue in its briefing, nor did the district court find, that Nurse Hand was a full-time or part-time employee of the Hospital. Rather, the district court summarily concluded that the definition of "employee" in the Greenspring Policy was unclear. It then applied the common law master-servant test, concluding that Nurse Hand was, at the time of her negligent conduct, under the control of the Hospital and therefore covered under the Greenspring Policy.

The method of insurance policy construction employed by the district court conflicts with District of Columbia law, which requires courts to give terms in an insurance policy their common, ordinary, popular meaning. Neither Interstate, the party with the burden of proof, nor the district court, cited any legal authority or proffered any evidence that temporary workers leased by a hospital from a staffing agency, like Nurse Hand, fit within the common, ordinary, popular meaning of full-time or part-time employees of the Hospital. Because temporary workers such as Nurse Hand do not fall within the definition of "employee" in the Greenspring Policy, the district court erred when, based solely upon its conclusion that Nurse Hand was a common law employee of the Hospital, it granted Interstate's motion

12

for partial summary judgment and denied Greenspring's motion for summary judgment.

The district court also erred when it resolved the question of Greenspring's and Interstate's coverage obligations to Nurse Hand for the claims brought against her by the Hospital and Ms. Banks by reference to the "other insurance" clauses in the insurers' policies. The correct approach, as has long been recognized by courts in multiple jurisdictions, is to prioritize the indemnification agreements of the insureds over the "other insurance" clauses in the policies of their insurers. Here, because Progressive, Interstate's insured, owed the Hospital both common law and contractual indemnity for claims arising from Nurse Hand's conduct, the burden of covering Nurse Hand should have remained squarely on Interstate. The "other insurance" clauses in the insurance policies should not have been considered.

Next, the district court erred in resolving Interstate's claim for contribution, a cause of action grounded in equity, without considering the inequitable result of its decision. The balance of the equities weighs heavily in favor of Interstate covering Nurse Hand because its policy was specifically purchased by Progressive to comply with its obligation to insure its registered nurse employees who were supplied to the Hospital and because there was no expectation on anyone's part that the Greenspring Policy would cover Nurse Hand.

Finally, the district court erred in failing to recognize that the allocation of

13

the settlement in the Banks Action (pursuant to which Interstate, on behalf of Nurse Hand and Progressive, paid nearly three times the amount paid by Greenspring on behalf of the Hospital) was partial consideration for the Hospital's releasing its common law and contractual indemnity claims against Progressive. The district court erroneously shifted the entire settlement paid by Interstate on behalf of Nurse Hand *and Progressive* onto Greenspring based solely on its conclusion that Greenspring owed Nurse Hand coverage.  Although it is undisputed that only Interstate covered Progressive, under the district court's ruling both Progressive and Interstate walked away without having paid anything to resolve the Hospital's common law and contractual indemnity claims against Progressive.  This was reversible error.

## <u>STANDARD OF REVIEW</u>

This Court reviews the district court's decisions on motions for summary judgment *de novo*, viewing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences accordingly.  *See Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 576 (D.C. Cir. 2013) (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Stewart v. St. Elizabeth's Hosp.,* 589 F.3d 1305, 1307 (D.C. Cir. 2010)).  Thus, in reviewing the district court's decision to grant Interstate's motion, the Court should view the evidence in the light most favorable to Greenspring and draw all reasonable

inferences in its favor. Conversely, when this Court reviews the district court's denial of Greenspring's motion for summary judgment, the Court must view the evidence in the light most favorable to Interstate and draw all reasonable inferences in its favor.

This insurance coverage dispute was before the district court based upon diversity. Thus, the District of Columbia's substantive law applies. *See A.I. Trade Fin., Inc. v. Petra Int'l Banking Corp.*, 62 F.3d 1454, 1458 (D.C. Cir. 1995) ("A federal court sitting in diversity must apply state law to the substantive issues before it.") (citing *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)).

## <u>ARGUMENT</u>

### I. Nurse Hand Was Not Covered By The Greenspring Policy Because She Was Not A Full-Time Or Part-Time Employee of the Hospital

It is undisputed that, as a threshold matter, Interstate cannot recover from Greenspring unless Interstate proves that Nurse Hand was covered under the Greenspring Policy. The district court correctly recognized that this coverage question turns solely on whether Nurse Hand was an "employee" of the Hospital as that term is defined in the Greenspring Policy at the time of the negligent conduct that gave rise to the Banks Action. (J.A. 656). The district court erred, however, when it ignored the common and ordinary meaning of the term "employee" in the Greenspring Policy, which includes only full-time and part-time employees of the

15

Hospital, not temporary workers like Nurse Hand, and instead applied the common law master-servant test to find that Nurse Hand was a covered "employee" of the Hospital.

### A. The District Court Erred by Applying the Common Law Master-Servant Test Instead of Considering the Ordinary, Common, Popular Meaning of the Words Full-Time and Part-Time in the Greenspring Policy's Definition of "Employee"

By its plain language, the Greenspring Policy's definition of "employee" includes only full-time and part-time employees of the Hospital, of which Nurse Hand was neither.  As the district court acknowledged, the definition does not reference "temporary employees such as Nurse Hand."  (J.A. 657).  Nor does it list workers leased from a staffing agency or others who happen to be within the control of a named insured or its subsidiaries at a given time. Based on this alone, the district court should have concluded that Nurse Hand was not covered under the Greenspring Policy and should have granted Greenspring's motion for summary judgment.

Instead, the district court incorrectly eschewed the plain language of the Greenspring Policy in favor of applying the common law master-servant test to conclude that Nurse Hand was an employee of the Hospital and therefore covered under the Greenspring Policy.  In so doing, the district court failed to adhere to the rules of insurance policy construction under District of Columbia law and incorrectly granted Interstate's motion for partial summary judgment and denied

16

Greenspring's motion for summary judgment.

As the district court recognized, under District of Columbia law, "[w]ords in a contract 'are to be given their common meaning.'" *Kakaes v. George Washington Univ.*, 683 A.2d 128, 132 (D.C. 1996) (quoting *Basch v. George Washington Univ.*, 370 A.2d 1364, 1367 (D.C. 1977)).  Furthermore, District of Columbia courts "follow the guideline that, unless it is obvious that words which appear in an insurance contract are intended to be used in a technical connotation, they will be given the meaning which common speech imports." *Chase v. State Farm Fire & Cas. Co.*, 780 A.2d 1123, 1127 (D.C. 2001).  Courts are to give the words used in an insurance contract their common, ordinary and popular meaning. *Quadrangle Dev. Corp. v. Hartford Ins. Co.*, 645 A.2d 1074, 1075 (D.C. 1994).  In addition, Courts may not "indulge in 'forced construction to create an obligation against the insurer.'" *Cameron v. USAA Prop. & Cas. Co.*, 733 A.2d 965, 968 (D.C. 1999) (quoting *Boggs v. Motors Ins. Corp.*, 139 A.2d 733, 735 (D.C. 1958)).  Rather, "[t]he clear meaning will be adopted whether favorable to an insured or not." *Quadrangle*, 645 A.2d at 1075 (quoting *Med. Serv. of D.C. v. Llewellyn*, 208 A.2d 734, 736 (D.C. 1965)).[1]

---

[1]  In its briefing below, Interstate incorrectly cited cases like these for the proposition that "D.C. courts will look to the ordinary, common *law* meaning of the term 'employee' to evaluate whether Nurse Hand qualifies as an insured employee under the Greenspring Policy." *See* Interstate's Mem. In Supp. Mot. for Partial S.J. at 21.  This misstates the rules of construction under D.C. law.

Here, instead of giving the words "full-time" and "part-time" employee their common, ordinary and popular meaning, which would not include temporary workers supplied to a hospital by a staffing agency such as Nurse Hand, the district court ignored those words completely and engaged in exactly the type of forced construction prohibited by D.C. courts. *Cameron*, 733 A.2d at 968.

The Greenspring Policy defined "employee" as "all past, present or future full-time or part-time employees[.]" (J.A. 516). Thus, under D.C. law, the district court was tasked with determining whether a temporary worker that is undisputedly the employee of a staffing agency, who is assigned on a shift-by-shift, as-needed basis to various hospitals by her staffing agency employer, is considered, under common speech, to be a full-time or part-time employee of the hospital to which she is temporarily assigned on a given day.

The district court failed to consider that question or conduct that analysis. Instead, it summarily concluded that the Greenspring Policy "does not clearly define the term [employee]" (J.A. 657), and launched into an analysis of the factors that courts use to determine who is considered an employee under common law master-servant principals. The district court erred because, on its face, the Greenspring Policy's definition of "employee" does not include *all* employees. Nor does it include common law borrowed servants, leased workers or (as the

18

district court acknowledged) temporary employees. It includes only full-time and part-time employees.[2]

In fact, the common understanding of the term "part-time employee" does not include temporary workers like Nurse Hand. For example, the definition of "part-time employee" utilized by the United States census is "[p]ersons paid on a part-time basis during the designated pay period. Included are those daily or hourly employees usually engaged for less than the regular full-time work week, as well as any part-time paid officials."[3] Nurse Hand was not paid at all by the Hospital, nor was she a daily or hourly employee of the Hospital. Rather, the Hospital paid a fee to Progressive for temporary staffing services. This definition certainly does not include individuals who, at a given moment, may be under the control of another, such as Nurse Hand. The United States Bureau of Labor Statistics defines "full time" and "part time" employment as follows: "[f]ull time is 35 hours or more hours per week; part time is 1 to 34 hours per week."[4] Nurse Hand did not work for the Hospital under any type of established schedule. She

---

[2] Interstate chides Greenspring for not including exclusionary language in its policy specifically addressing Nurse Hand. However, there was no need for Greenspring to do so, as it specifically listed the types of employees that it *did* wish to cover within the coverage grant of the policy, *i.e.*, full-time and part-time employees. As Nurse Hand was neither, she is not covered.

[3] Definitions for Federal, State, & Local Governments, U.S. CENSUS BUREAU, http://www.census.gov/govs/definitions (last visited Aug. 23, 2013).

[4] *Labor Force Statistics from the Current Population Survey*, U.S. BUREAU OF LABOR STATISTICS, http://www.bls.gov/cps/lfcharacteristics.htm (last visited Aug. 23, 2013).

would not be considered a "part-time" employee under this definition merely because she was under the control of the Hospital on April 6, 2004.

The burden was on Interstate, the plaintiff and party seeking contribution from Greenspring, to prove that Nurse Hand is an insured under the Greenspring Policy. *See Evans v. Med. Inter-Ins. Exch.*, 856 A.2d 609, 613 (D.C. 2004) (citing *Robinson v. Aetna Life Ins. Co.,* 288 A. 2d 236, 238 (D.C. 1972); *Group Hospitalization, Inc. v. Foley,* 255 A.2d 499, 500-01 (D.C.1969)). Interstate failed to meet its burden of demonstrating, through evidence or legal authority of any kind, that Nurse Hand and temporary workers like her are, under the common understanding, full-time or part-time employees of the customers to whom her temporary agency employer assigns her. Instead, Interstate simply ignored the plain language of the Greenspring Policy's definition of "employee" and went about proving the unremarkable (and undisputed) fact that Nurse Hand was under the control of the Hospital at the time of the negligent conduct that caused Ms. Banks' injuries.

The error committed by the district court when it decided to ignore the Greenspring Policy's inclusion of the words "full-time" and "part-time" in its definition and read the Greenspring Policy to include all types of employees comes into sharp focus when the definition of "employee" in the Greenspring Policy is

compared to the language establishing the scope of coverage for employees in the Interstate Policy.

| **Greenspring Policy** | **Interstate Policy** |
|---|---|
| "***Employee(s)*** means all past, present, or future full-time or part-time ***Employees*** of the ***Named Insured*** including subsidiaries of the ***Named Insured***." (J.A. 516). | "Any current or former employee of the **Named Insured**, but only while such employee is or was…acting on behalf of the **Named Insured**, and only within the employee's duties as such…" (J.A. 444). |

By its terms, the Interstate Policy provides coverage to ***any*** current or former employees acting within the scope of their employment. In contrast, by its terms, the Greenspring Policy only provides coverage to past, present, or future ***full-time*** and ***part-time*** employees. Yet, the district court interpreted the Greenspring Policy as if it was written as broadly as the Interstate Policy, simply ignored the words "full-time" and "part-time," and expanded the scope of the Greenspring Policy to provide coverage to any individual who could be deemed a common law servant of any covered MedStar entity under any theory. This was reversible error.

Even within the insurance industry, an individual leased from a staffing agency or who is brought in to fill in on a temporary basis is not commonly referred to as a full-time or part-time employee. Rather, these workers are known

as "leased workers" or "temporary workers" depending on the circumstances.[5] Neither of those types of workers was included in the Greenspring Policy's definition of "employee."

There was no basis upon which the district court could have concluded that Nurse Hand fell within the common understanding of "full-time" or "part-time" employee of the Hospital. Thus, Greenspring was entitled to summary judgment. The district court erred in applying the common law master-servant test to determine Nurse Hand's status as a covered employee under the Greenspring Policy, in granting Interstate's motion for partial summary judgment, and in denying Greenspring's motion for summary judgment.

---

[5] By way of example, the following cases all involved insurance policies which defined individuals supplied to an entity under an agreement with a labor leasing firm as "leased workers" and defined "temporary worker" as a person furnished to substitute for a permanent employee on leave or to meet seasonal or short-term workload conditions. Neither type of worker is referred to as a "part-time employee": *Wellington Specialty Ins. Co. v. Kendall Crane Serv.*, 434 F. App'x 794, 796 (11th Cir. 2011); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Zurich Ins. Co.*, 2011 WL 1103475, at *3 (N.J. Super. Ct. App. Div. Mar. 28, 2011); *Nationwide Prop. & Cas. Ins. Co. v. Brinley's Grading Serv., Inc.*, 737 S.E.2d 192 (N.C. Ct. App. 2013); *Mendenhall v. Prop. & Cas. Ins. Co. of Hartford*, 375 S.W.3d 90, 91-92 (Mo. 2012); *Key Const., Inc. v. Colony Ins. Co.*, No. 3-10-CV-0297-BD, 2011 WL 2728138, at *1 (N.D. Tex. July 13, 2011); *Maxum Indem. Co. v. New Jersey Iron, Inc.*, Civ. No. 09-6397, 2010 WL 4853644 (D.N.J. Nov. 22, 2010).

**B.     Even if the Meaning of "Employee" in the Greenspring Policy Could be Disputed or if the District Court Was Correct that the Greenspring Policy's Definition of "Employee" was Unclear, the District Court Erred by Applying the Common Law Master-Servant Test**

The Greenspring Policy's definition of "employee" includes only full-time and part-time employees, not temporary workers like Nurse Hand who are assigned to the Hospital by a staffing agency.  However, even if the meaning of the words "full-time or part-time employee" could be legitimately disputed or were not clearly defined in the Greenspring Policy, the district court erred by applying common law master-servant principals to resolve the issue.

As discussed above, words in an insurance policy are to be given their common, ordinary, popular meaning.  However, in the event of a dispute with regard to the meaning of a policy term, "[i]t is a fundamental principle that '[t]he first step in contract interpretation is determining ***what a reasonable person in the position of the parties*** would have thought the disputed language meant.'" *District of Columbia v. C.J. Langenfelder & Son, Inc.*, 558 A.2d 1155, 1159 (D.C. 1989) (quoting *Intercounty Constr. Corp. v. District of Columbia,* 443 A.2d 29, 32 (D.C.1982) (emphasis added) (citations omitted)).

Furthermore, even if the term "full-time or part-time employee" were ambiguous, which it is not, this Court has acknowledged that, per the instructions of the D.C. Court of Appeals, its duty is to "interpret any ambiguous provisions in

23

a manner consistent with the reasonable expectations of the purchaser of the policy." *Whiting v. AARP*, 637 F.3d 355, 361 (D.C. Cir. 2011) (quoting *Travelers Indem. Co. of Illinois v. United Food & Commercial Workers Int'l Union*, 770 A.2d 978, 986 (D.C. 2001)).

The district court failed to follow these well-settled rules of construction. Instead, after summarily deciding that the Greenspring Policy did not clearly define the word "employee," it proceeded to apply the common law master-servant test to determine whether Nurse Hand was a covered "employee." Had the district court examined the record, it would have found that none of the relevant parties had any expectation that Nurse Hand would be considered a covered "employee" under the Greenspring Policy.

The parties to the Greenspring Policy were Greenspring, MedStar and the Hospital. Because Greenspring, a subsidiary of MedStar, is MedStar's captive insurer, MedStar is the only entity that could be considered to have "purchased" the Greenspring Policy.[6] Thus, the district court should have considered the understanding and reasonable expectations of these parties to resolve any dispute or ambiguity the Greenspring Policy. *See Langenfelder*, 558 A.2d at 1159.

---

[6] "A 'captive insurance company' is a corporation organized for the purpose of insuring the liabilities of its owner." *Clougherty Packing Co. v. C.I.R.*, 811 F.2d 1297, n.1 (9th Cir. 1987).

Had it done so, it would have found evidence in the record that it was the understanding and expectation of the parties to the Greenspring Policy that temporary workers such as Nurse Hand would be not be covered by the Greenspring Policy.   Larry Smith, Vice President of Risk Management for MedStar, who is also Greenspring's President, testified in his declaration that it was the understanding of both Greenspring and MedStar that the Greenspring Policy would provide coverage to only those employees that it, or its member entities (like the Hospital), had hired, but not to temporary workers such as agency nurses.   (J.A. 603).   The Hospital also had no expectation that the Greenspring Policy would cover temporary workers like Nurse Hand, as evidenced by its standard practice of requiring the staffing agencies with which it did business to purchase coverage for their registered nurse employees.   (J.A. 525-26).

Neither Progressive's nor Nurse Hand's expectations are relevant.   Neither was a party to the Greenspring Policy, neither bargained for nor was promised coverage under the policy, and neither purchased the policy.   To the contrary, Progressive contractually agreed to purchase professional liability insurance for Nurse Hand, paid a premium to Interstate for this insurance, and both Progressive and Nurse Hand were covered under the Interstate Policy for the claims in the Banks Action.   Most importantly, the Court should not consider Interstate's *post facto* protestations as to the meaning of "employee" as defined by the Greenspring

Policy which are being offered solely in an attempt by Interstate to relieve itself of its bargained-for coverage obligations.

Even if the expectations of Nurse Hand were relevant, her testimony in the Banks Action makes clear that she did not consider herself to be an "employee" of the Hospital. At her deposition in the Banks Action, Nurse Hand distinguished between health care facilities by whom she was employed (which did not include the Hospital) and facilities at which she worked "for Progressive," which included the Hospital and Prince George's Hospital. (J.A. 572). Thus, the only evidence in the record is that Nurse Hand did not consider herself to be an employee of the Hospital when she worked there as a registered nurse employee of Progressive. There is simply no basis in the record (or otherwise) upon which to conclude that Nurse Hand, who was paid by Progressive and could be assigned to a different client of Progressive's on a daily basis, had a reasonable expectation that she would be deemed a "full-time or part-time employee" of the Hospital while she worked there.

The district court erred when it found the Greenspring Policy's definition of "employee" to be unclear. It compounded that error by failing to consider the expectations of the parties to the Greenspring Policy, under which Nurse Hand was not to be insured by the Greenspring Policy, and instead defaulting to the common

law master-servant test.  Thus, the district court should be reversed and judgment should be entered in Greenspring's favor.

> **II.**   **Even if Nurse Hand Was An Employee under the Greenspring Policy, the District Court Erred by Determining the Obligations of the Insurers Based Upon the "Other Insurance" Clauses Instead of the Indemnification Provision of the Staffing Agreement**

Even assuming *arguendo* that, as Interstate argues, Nurse Hand were an insured under the Greenspring Policy (which she is not), the district court erred as a matter of law by ignoring the allocation of risk agreed to by the parties in the Staffing Agreement in favor of determining priority of coverage by reference to the "other insurance" clauses.

Under Interstate's theory that the "other insurance" clauses control the coverage obligations of the insurers, Greenspring, the insurer for the Hospital, was obligated to cover Nurse Hand instead of Interstate, even though Greenspring could then seek reimbursement from Progressive pursuant to the Staffing Agreement's indemnity provision, which would then be covered by Interstate.

Overwhelmingly, courts have rejected this method of determining the priority of coverage and have  held that an underlying contract by one insured to indemnify another, which often includes the indemnitor's commitment to obtain insurance to back up that obligation (as it did here), requires the indemnitor's insurers to pay the loss, regardless of any "other insurance" clauses.

27

In *Wal–Mart Stores, Inc. v. RLI Insurance Co.,* 292 F.3d 583, 588 (8th Cir. 2002), the Eighth Circuit held that a valid, enforceable indemnification agreement between insureds, not the "other insurance clauses" in their insurers' policies, determined the allocation of liability in an insurance dispute.  In particular, the *Wal-Mart Stores* court followed the general rule, as stated by a "leading commentator," that "an indemnity agreement between the insureds or a contract with an indemnification clause ... may shift an entire loss to a particular insurer notwithstanding the existence of an 'other insurance' clause in its policy." *Id.*, 292 F.3d at 586 (quoting LEE R. RUSS & THOMAS F. SEGALLA, 15 COUCH ON INSURANCE, § 219:1, at 219–7 (3d ed.1999)).

*Wal-Mart Stores* arose out of a dispute about a sales agreement between Cheyenne, a distributor of halogen lamps, and Wal-Mart, which sold those lamps at retail.  The agreement required Cheyenne to indemnify Wal-Mart for any liability arising from Wal-Mart's sale of the lamps. After one of the lamps malfunctioned, the injured plaintiff sued Wal-Mart and Cheyenne in state court. Cheyenne had procured insurance covering itself and Wal-Mart from St. Paul, which provided $1 million in primary coverage, and from RLI, which provided $10 million in excess coverage over the St. Paul policy, coverage which extended to Cheyenne's contractual indemnity obligation to Wal-Mart. Wal-Mart, however, was also covered by its own $10 million policy with another insurer, National

Union, which did not cover Cheyenne.  Pursuant to its "other insurance clause," the RLI policy was excess to any non-scheduled policy, which included the National Union policy.

The underlying suit was settled for $11 million.  St. Paul paid $1 million of that settlement, and RLI paid the remaining $10 million and reserved the right to seek recovery from Wal-Mart and National Union.  Subsequently, Wal-Mart and National Union brought a declaratory judgment action to determine whether either was obligated for any part of the settlement.  RLI counterclaimed, contending that its policy applied in excess of National Union's, so that it was entitled to contribution from National Union, Wal-Mart's primary insurer, for all or part of the $10 million it had paid.

The Eighth Circuit gave priority to the indemnity agreement over the "other insurance" clauses and held that neither National Union nor Wal-Mart was obligated to contribute anything to the underlying settlement.  Thus, despite RLI's "other insurance" provision, providing that the RLI policy would be excess over any non-scheduled policy, as to Wal-Mart, RLI, Cheyenne's insurer, was bound by Cheyenne's agreement to indemnify Wal-Mart.  Thus, it was liable for the entire $10 million remainder of the settlement.

The *Wal-Mart Stores* court based its decision on several factors that apply equally in this case.  First, the court stated that "examination of the relationships

between the parties has convinced us that Cheyenne intended to and did make a valid promise to indemnify Wal-Mart for claims arising from the halogen lamps." *Id.* at 587.  Second, the court determined that "RLI provided liability insurance to Cheyenne that covers both the [underlying] settlement and Cheyenne's indemnification obligation." *Id.*  Third, the court explained that under the circumstances of that case, "consideration of the indemnity agreement reflects the intention of [and relationship between] the parties and does not unfairly prejudice the insurers." *Id.*

Here, an examination of the relationships between the parties confirms that Progressive intended to and did make a valid promise to indemnify the Hospital for Nurse Hand's negligence.  Furthermore, like RLI in *Wal-Mart Stores*, Interstate provided coverage to Progressive for both the settlement of the Banks Action and Progressive's indemnification obligation.  (J.A. 367, 446).  Finally, as in *Wal-Mart Stores*, consideration of Progressive's indemnification obligation reflects the intention and relationship of the parties and does not unfairly prejudice Interstate, which is only being asked to provide the very coverage it was paid to provide by Progressive. *See also St. Paul Fire & Marine Ins. Co. v. Am. Int'l Specialty Lines Ins. Co.*, 365 F.3d 263, 270-71 (4th Cir. 2004) (concluding that Virginia Supreme Court would adopt the reasoning of *Wal-Mart Stores* and holding that indemnification provisions between insureds controlled insurers' liability for

payment of settlement); *Am. Indem. Lloyds v. Travelers Prop. & Cas. Ins. Co.*, 335 F.3d 429, 436 (5th Cir. 2003) (adopting reasoning of *Wal-Mart Stores* and holding that plaintiff insurer was liable for full amount it paid in settling underlying personal injury action, notwithstanding "other insurance" language in policy, as its insured had contractually agreed to indemnify defendant's insured); *St. Paul Fire & Marine Ins. Co. v. Lexington Ins. Co.*, No. 05-80230-CIV, 2006 WL 1295408, at *5 (S.D. Fla. Apr. 4, 2006) (holding that indemnity agreement, not other insurance clauses, controlled apportionment of loss).

The *Wal-Mart Stores* decision follows a long line of cases in which courts have disregarded "other insurance" clauses in favor of indemnification agreements when resolving which insurance policy pays for a loss. Indeed, "[i]t is a disfavored approach to resolve disputes among insurance carriers on the basis of a dogmatic reliance on the 'other insurance' clauses of respective policies without regard to the intent of the parties as manifested in the overall pattern of insurance coverage." *Berkeley v. Fireman's Fund Ins. Co.,* 407 F. Supp. 960, 969 (W.D. Wash. 1975).

In *American Fidelity & Casualty Company v. Simmons*, 253 F.2d 634 (4th Cir. 1958), the lessee agreed to carry a liability insurance policy on a leased vehicle. The lessee's insurance company paid a judgment obtained by an injured party against the lessee and then sought to recover indemnity from the lessor. In affirming the lower court's judgment denying recovery, the court stated:

> The lease agreement provided that Webb [Lessee] should procure insurance to cover this liability, and the reasonable interpretation of the agreement is that it should protect against all liability arising out of the operation, not that it should protect merely the liability of Webb with the right of Webb or the insurer to recover over against Simmons the amount of any liability they might be required to pay. Without going into the question as to whether the liability of Webb, without reference to the agreement respecting insurance, is primary or secondary, it would be unconscionable, in the light of the provision in the lease agreement, to allow Webb to recover of Simmons indemnity for the liability which Webb had agreed with Simmons to cover with insurance; and, of course, the rights of the casualty company by way of subrogation cannot be superior to the rights of Webb.

*Id.* at 636.

Here, Progressive agreed to procure insurance covering the liability for Nurse Hand's work at the Hospital, not merely insurance that would cover Nurse Hand with the right of Nurse Hand or Interstate to recover from the Hospital or Greenspring, the Hospital's insurer. Thus, like the insurer in *Simmons*, Interstate should not be able recover from the Hospital or Greenspring.

Courts applying this rule often do not consider the provisions that dictate whether a policy is primary or excess. In *Aetna Insurance Co. v. Fidelity & Casualty Co. of New York,* 483 F.2d 471 (5th Cir. 1973), the court did not even bother to determine whether the policies at issue were primary or excess. It determined that such provisions, in light of the indemnification agreement, were "immaterial and irrelevant," holding that "the Indemnity Agreement ... *controls all the rights and obligations of the parties and their privies (the insurers).*" *Id.* at

472-73 (emphasis added). Similarly, in *Chubb Insurance Co. of Canada v. Mid-Continent Casualty Co.,* 982 F. Supp. 435, 472-73 (S.D. Miss. 1997), the court gave the indemnification agreement absolute priority over "other insurance" clauses in the respective insurers' policies finding that the indemnitor's "insurers necessarily have the primary obligation to defend [the indemnitee] relative to those claims, without regard to any insurance which [the indemnitee] might have." *Id.* The priority provisions of the indemnitor's policies were "immaterial and irrelevant" because "the parties' rights and obligations were governed by the indemnity agreement." *Id.* at 438.

In *Rossmoor Sanitation, Inc. v. Pylon, Inc.,* 119 Cal. Rptr. 449 (1975), a contractor's insurer, relying on the "other insurance" clauses, argued that the owner's insurer should contribute to a personal injury settlement. In requiring the contractor's insurer to pay all the damages, the court noted first that "[t]here is no evidence that either company knew there was or would be other insurance when they issued the policies. The fact that there is other insurance is a mere fortuitous circumstance." *Id.* at 456. That is, of course, equally true here. The court went on to say that the most compelling factor, also true in the present case, was as follows:

> [T]o apportion the loss of this case pursuant to the other insurance clauses would effectively negate the indemnity agreement and impose liability on [the owner's insurer] when Rossmoor bargained with Pylon to avoid that very result as part of the consideration for the construction agreement. We therefore conclude that the rights of the indemnity and subrogation must control....

33

*Id.* at 456-57. *See also Pac. Plumbing & Heating Co. v. Aetna Cas. & Sur. Co.,* C 93-20561 RMW, 1995 WL 232396, at *8 (N.D. Cal. Apr. 13, 1995) (interpreting "main point" of *Rossmoor* as being that "apportioning the loss as requested would have caused the owners' carrier to pay for a liability that the owner and contractor had bargained would fall on the contractor"); *J. Walters Constr., Inc. v. Gilman Paper Co.,* 620 So.2d 219, 221 (Fla. Dist. Ct. App. 1993) (refusing to apply the "other insurance" clauses where doing so "would serve to abrogate the indemnity agreement between [the underlying parties]" and emphasizing that indemnitor's insurer agreed to provide coverage for the indemnitor's "contracted-for liability"); *Am. Underwriters, Inc. v. Auto-Owners Mut. Ins. Co.,* 454 N.E.2d 876, 877 (Ind. Ct. App. 1983) (requiring indemnitor's insurer to pay entire loss because "parties may by contractual arrangement shift their respective burdens of risk thereby effecting the obligations of their insurers"); *United States Fid. & Guar. Co. v. Aetna Cas. & Sur. Co.,* 418 F.2d 953, 956 (8th Cir. 1969) (no contribution from indemnitee's insurer based on underlying agreement and "considerations of fairness").

Courts have also been reluctant to allow an insurer to benefit from the fortuitous presence of "other insurance" that it did not bargain for. In *Interstate Fire & Casualty Co. v. Auto-Owners Insurance Co.,* 433 N.W.2d 82 (Minn. 1988), a high school student was severely injured by another student. The school carried

34

primary and excess liability insurance, and the father of the student who caused the injury carried a homeowner's policy which would have covered the liability. The Minnesota Supreme Court held that, when the school's primary policy was exhausted, the school's excess policy, not the father's homeowner's policy, must pay all of the remaining loss. The court brushed aside the argument that the excess insurer relied upon underlying insurance in setting low premiums because, as the court pointed out, the excess insurer can only justifiably rely on the insurance it knows about, not other insurance carried by other parties, which fortuitously covers the accident in question:

> While it is true that Interstate [the excess insurer] relied on [the scheduled underlying insurer's] primary coverage in setting its premium, Interstate was not further relying on each student having a family homeowners policy when it calculated its risk in insuring the school district.

*Id.* at 86.

Here, Interstate did not rely on the Greenspring Policy being primary as to Nurse Hand, nor did it even know about the Greenspring Policy when it calculated its premiums. Rather, it accepted over $655,000 from Progressive to cover claims such as those brought by Ms. Banks and the Hospital. (J.A. 429). Neither Greenspring nor the Hospital ever agreed to the "other insurance" language in Interstate's policy. Interstate should not be allowed to avoid its bargained-for coverage obligation, which included covering Progressive for the Hospital's

indemnification claims *post facto*, through the fortuitous windfall of the Greenspring Policy's "other insurance" clause.

Interstate argued below that the district court should ignore the *Wal-Mart Stores* line of cases in favor of the Fourth Circuit's decision in *Travelers Property Casualty Company of America v. Liberty Mutual Insurance Company*, 444 F.3d 217 (4th Cir. 2006) and find that the "other insurance" clauses, not the indemnification provision in the Staffing Agreement, should control. However, *Liberty Mutual* is not controlling authority in this circuit and is readily distinguishable from this case in several important ways.

First, in *Liberty Mutual*, Ryland, a real estate manager, brought suit against both Travelers, its own insurer, and Liberty Mutual, which issued an insurance policy to State Street, the owner of the building where the accident occurred, claiming to be an insured under both policies. Here, Nurse Hand is not seeking coverage from Greenspring. Rather, Interstate is attempting to tap into the Greenspring Policy to avoid its bargained-for coverage obligations to Nurse Hand and Progressive's bargained-for insurance procurement obligations under the Staffing Agreement.

Second, in *Liberty Mutual*, Travelers, the insurer of Ryland, the party with the indemnity obligation, was not attempting to shift the entire burden of coverage onto Liberty Mutual, the indemnitee's insurer, through the "other insurance"

36

clauses. Rather, Travelers argued that Liberty Mutual should contribute with it on an equal basis because Ryland was an insured under both policies. Here, Interstate is attempting to foist its entire coverage obligation onto Greenspring based upon a strained and incorrect interpretation of "employee" and the presence of a fortuitous "other insurance" clause in the Greenspring Policy.

Third, *Liberty Mutual* did not involve a third party, like Progressive, that had an indemnification obligation that was undisputedly insured by only one of the insurers.

Fourth, in *Liberty Mutual*, State Street had not asserted indemnification claims against Ryland as the Hospital asserted against Nurse Hand and Progressive here. The only claims at issue were the claims of the tort-plaintiff against Ryland.

Finally, the agreement between State Street and Ryland in *Liberty Mutual* did not include an insurance procurement obligation on the part of Ryland. Here, Interstate's insured, Progressive, purchased the Interstate Policy to cover Nurse Hand in order to comply with its insurance procurement obligation to the Hospital as set forth in the Staffing Agreement.

The district court erroneously rejected the holdings in the *Wal-Mart* line of cases on the basis that the Hospital released its indemnity claim against Progressive as part of the settlement of the Banks Action. This misses the point and significance of the holding in *Wal-Mart* and the other cases cited above.

Interstate reserved its right to reallocate the settlement if, because of the presence of the "other insurance" clauses in the policies, it had paid more than its fair share of the settlement of the Banks Action and Greenspring had paid less than its fair share of the settlement. The "other insurance" clauses cannot be considered in a vacuum. The scope of the insurers' coverage obligations for the claims against Nurse Hand, including the applicability of the "other insurance" clauses, must be evaluated in light of all of the facts that existed at the time Nurse Hand was sued, which was when a duty to defend her was triggered, and at the time the Banks Action was settled, at which time the duty to indemnify was implicated.

The fact that the Hospital released its indemnification claims against Progressive as part of the Settlement Agreement does not and cannot change Interstate's coverage obligations in the first instance. Thus, the district court erred in deciding the coverage obligations of Greenspring and Interstate vis-à-vis Nurse Hand by reference to the "other insurance" clauses.

**III.    The District Court Erred When It Granted Summary Judgment as to Interstate's Equitable Claim for Contribution Because the Equities Favor Greenspring, Not Interstate**

The district court erred in granting Interstate's motion for partial summary judgment as to its claim for contribution, an equitable remedy, without considering

the inequitable result of its decision.[7]

Contribution is a cause of action that is grounded in equity.  As this court has stated:

> Before a right of contribution arises, a joint debtor must first establish that he paid more than his *pro rata* share. *See Merchants Mutual Insurance Co. v. Richardson,* 273 A.2d 652, 655 & n. 5 (D.C.App.1971); *Ottenstein v. Julius Garfinkel & Co.,* 151 A.2d 925, 927 (D.C.Mun.App.1959) (holding that the right of contribution between joint debtors "arises only when one has paid more than his share of the joint obligation"); *Fithian v. Jamar,* 286 Md. 161, 169–70, 410 A.2d 569, 573–74 (1979) (holding that a "right of contribution is an inchoate claim which does not ripen into being unless and until ... [an obligor] pays more than her proportionate share" of the note); *see also* 2 Williston on Contracts § 345 (3d ed. 1959), at 772 ("It has been frequently laid down that no right to contribution in favor of a joint debtor exists until actual payment by him of more than [his] share of the whole debt...." (footnotes omitted)).

*Pleasants v. Loc*ke, 924 F.2d 1144, 1146 (D.C. Cir. 1991); *see also Green Leaves Rest., Inc. v. 617 H St. Associates*, 974 A.2d 222, 239 (D.C. 2009) ( "[S]ince the right to contribution is inherently equitable in nature, the rule logically follows that where co-obligors have received unequal benefits from the common obligation, the portion of the contribution that each must bear is according to the benefits that each has received.") (quoting *Reliance Group Holdings, Inc. v. Nat'l Union Fire Ins. Co.,* 188 A.D.2d 47, 594 N.Y.S.2d 20, 26 (N.Y.App.Div.1993) (citation

---

[7] Interstate's complaint included counts for breach of contract, declaratory judgment, contribution and subrogation.  (J.A. 23-25).  However, it sought summary judgment only as to its claims against Greenspring for declaratory judgment and contribution.  (J.A. 34).

omitted)).

Here, an objective consideration of the equities favors Interstate shouldering the cost of the defense and indemnity of Nurse Hand and Progressive, not Greenspring. First, Interstate accepted a $655,000 premium from and issued a policy to Progressive for the specific purpose of insuring it and its registered nurse employees for claims arising from the work that Progressive's registered nurse employees did for Progressive's customers, like the Hospital. Second, the Hospital and Progressive specifically agreed in the Staffing Agreement that Progressive would maintain insurance covering the registered nurse employees, and Progressive purchased the Interstate Policy to fulfill this obligation. Third, the only evidence in the record is that neither the parties to the Greenspring Policy and the Staffing Agreement, nor Nurse Hand, had any expectation that the Greenspring Policy would cover Nurse Hand. Conversely, the evidence in the record indicates that it was the expectation of those same parties that the Interstate Policy *would* cover Nurse Hand. Finally, it is undisputed that Interstate was the only insurer who covered Progressive for the Hospital's and Ms. Banks' claims against it.

Because all of these factors shift the balance of the equities in favor of Greenspring and against Interstate, the district court erred when it found in favor of Interstate on its claim for contribution. In so doing, it has allowed Interstate, through the use of a self-serving and incorrect reading of the Greenspring Policy

40

(to which neither it nor its insured were parties) to dodge its bargained-for coverage obligation to Progressive and Nurse Hand and shift that obligation onto Greenspring.

### IV. The District Court Erred When It Held that Greenspring Was Obligated to Indemnify Interstate For the Full Amount It Paid to Settle the Banks Action by Failing To Account For the Hospital's Release of its Contractual Indemnity Claim Against Progressive

In its Motion for Partial Summary Judgment, which was erroneously granted by the district court, Interstate argued that Nurse Hand was an insured under the Greenspring Policy and thus Greenspring owed her a defense and indemnity in the Banks Action. Interstate did not, and could not, allege that Progressive was insured by Greenspring or that Greenspring had any obligation to contribute to the settlement of the Banks Action on behalf of Progressive. Similarly, in its Memorandum Opinion the district court concluded that "Nurse Hand was an employee at the time of the alleged negligence, and therefore was a covered 'insured' under [Greenspring's] policy." (J.A. 662). The district court did not hold that Progressive was an insured under the Greenspring Policy, nor could it have, because it is undisputed that Progressive was insured by Interstate, not Greenspring. (J.A. 367). Thus, there was never any argument by Interstate or a determination by the district court that Greenspring was obligated to pay Progressive's share of the settlement of the Banks Action.

41

Yet, in its Memorandum Order accepting Magistrate Judge Kay's findings and recommendations and resolving Interstate's damages claim, the district court ordered Greenspring to pay the full $3,055,000 settlement of the Banks Action. It did so despite acknowledging, both in its Memorandum Opinion resolving the parties' dispositive motions (J.A. 663) and in its Memorandum Order regarding damages (J.A. 947), that the Hospital, and its insurer, Greenspring, had a viable claim for indemnification against Progressive that they released as part of the settlement of the Banks Action. By failing to account for the fact that Interstate paid $3,055,000 both to settle Ms. Banks' claims *and* to obtain a release of the Hospital's claims against Progressive, Interstate's insured, the district court erroneously voided key terms of the Settlement Agreement and allowed Progressive and Interstate to escape their obligation to indemnify the Hospital for its claims against Progressive. This was reversible error.

The Hospital's third-party complaint against Progressive and Nurse Hand included claims against Progressive for common law indemnity, *contractual indemnity* based upon the indemnity provision in the Staffing Agreement, and contribution. Specifically, the Hospital's complaint against Progressive sought contractual indemnity for any liability assigned to it resulting from Nurse Hand's negligence. (J.A. 357-358). The Settlement Agreement recognized that those claims were the subject of the settlement in its Recitals. (J.A. 367).

42

In the Settlement Agreement, Interstate acknowledged that, as Progressive's liability insurer, it was obligated to pay any claim made against Progressive, as follows:

> Interstate Fire & Casualty Company…is the liability insurer of Progressive, and, as such, would be obligated to pay any claim made or judgment obtained against any individual or entity qualifying as an insured under its policies.

*Id.*

Furthermore, in the Settlement Agreement, Interstate agreed to pay $3,055,000 on behalf of Nurse Hand (the individual) and Progressive (the entity), as follows:

> Interstate Fire & Casualty… on behalf of the individuals and entities qualifying as insureds under its policies, promises to pay the amounts set forth…below

(J.A. 369).

Finally, pursuant to the Settlement Agreement the Hospital released its claim for contractual indemnity against Progressive as follows:

> This release shall extend to every type of claim, whether based on a tort, contract or other theory of recovery, including but not limited to the Temporary Staffing Agreement, which Washington Hospital Center now has, or which may hereafter accrue or otherwise be acquired, on account of, or in any way growing out of the facts giving rise to the Litigation.

(J.A. 368).

Although the Settlement Agreement did not allocate the settlement payment to any particular claim, by the plain terms of the agreement, some portion of Interstate's contribution to the settlement of the Banks Action payment on behalf of Nurse Hand and Progressive (which was nearly three times the amount that the Hospital paid) was allocable to resolving the Hospital's indemnity claims against Progressive. The carve-out to the Settlement Agreement did not allow Interstate to do anything more than reallocate the settlement payment based upon the "other insurance" clauses and their effect on Greenspring's coverage obligation to Nurse Hand. The "other insurance" clauses are unrelated to and have no effect on Progressive's common law and contractual indemnity obligations to the Hospital because it is undisputed that Progressive was not an insured under the Greenspring Policy. Thus, the Court's holding that Nurse Hand was an insured under the Greenspring Policy cannot shift the entire cost of the settlement of the Banks Action, including what was paid by Interstate on behalf of Progressive, onto Greenspring.

The district court erred in deciding, on one hand, that the Hospital released its indemnification claims against Progressive, thereby precluding it from arguing that the indemnification provisions in the Staffing Agreement take priority over the "other insurance" clauses, but then, on the other hand, deciding that the release was granted for no consideration whatsoever and was not a factor in Interstate's paying

the bulk of the settlement in the Banks Action. Thus, if this Court decides that Nurse Hand was an insured under the Greenspring Policy, and that the "other insurance" clauses (and not the indemnification provisions of the Staffing Agreement) control the coverage obligations of the insurers, it should remand this matter back to the district court for a factual determination as to what portion of the $3,055,000 paid by Interstate is attributable to Nurse Hand and what portion is attributable to the settlement of the Hospital's claims against Progressive.

The district court erroneously held that Greenspring waived this argument by not raising it in its Answer or in its summary judgment briefing. In fact, in it Answer, Greenspring specifically denied the single paragraph in the count for contribution in the complaint in which Interstate alleged that "pursuant to the terms and conditions of the insurance policies at issue in this case, defendants are obligated to reimburse Interstate for the sums it expended in defending Hand and Progressive in the Underlying Litigation and in settling the Underlying Litigation." (J.A. 24, 30). Furthermore, as the party seeking summary judgment, it was Interstate's burden to identify "those portions of the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, which it believe[d] demonstrate the absence of a genuine issue of material fact" that it was entitled to recover the amount it paid to defend Progressive and settle the Banks Action on behalf of Progressive. (J.A. 655-656) (*quoting Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Interstate failed to meet its burden because there is no evidence in the record or viable theory under which it is entitled to shift onto Greenspring the cost of defending Progressive and settling the Hospital's and Nurse Hand's claims against Progressive.

The district court also concluded that because Interstate reserved its right in the Settlement Agreement to reallocate the settlement based upon the "other insurance" clauses, and Greenspring did not, Greenspring cannot now take the position that Interstate is not entitled to recover the entire $3,055,000 settlement payment. This is incorrect. Greenspring is not seeking to reallocate the settlement nor is it asserting an indemnification claim. Rather, Greenspring is arguing that the existence of the "other insurance" clauses, which is the sole basis for Interstate's claim for contribution, cannot affect Interstate's coverage obligation to Progressive and thus cannot serve as the basis for shifting the entirety of the payment made by Interstate onto Greenspring, which did not insure Progressive. The result of the district court's ruling is that Interstate paid nothing to defend Progressive or settle both the Hospital's and Ms. Banks' claims against Progressive even though it was undisputedly the only insurer covering Progressive. Instead, Greenspring is being forced to pay the defense costs and settlement payment for Progressive, which it did not insure. This result is contrary to the terms of the Settlement Agreement and was erroneous. Instead, Interstate should have been required to prove what

portion of its settlement payment was attributable to Nurse Hand.

## **CONCLUSION**

For these reasons, Greenspring asks the Court to reverse the district court and remand this case to the district court with instructions that it grant Greenspring's motion for summary judgment and deny Interstate's motion for partial summary judgment.

Respectfully submitted,


/s/Joseph B. Wolf
Linda S. Woolf, Esq. (#54132)
lsw@gdldlaw.com
Joseph B. Wolf, Esq. (#54892)
jbw@gdldlaw.com
Goodell, DeVries, Leech & Dann, LLP
One South Street, 20th Floor
Baltimore, Maryland 21202
(410) 783-4000
(410) 783-4040 (Facsimile)
***Attorneys for Appellant***

## **CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)

(7)(B) because, according to the word processing software employed by my firm, it

contains 12,225 words.

/s/ Joseph B. Wolf
Joseph B. Wolf


## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 10th day of September, 2013, this Brief

was electronically filed and served on:

David D. Hudgins, Esq.
Hudgins Law Firm
515 King Street
Suite 400
Alexandria, VA  22314

Bethany K. Culp
Paulette S. Sarp
3333 S. Seventh Street
Suite 2000
Minneapolis, MN  55402
***Attorneys for Appellee***

/s/ Joseph B. Wolf

4832-0567-8356, v.  2

48