**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

SEPTEMBER TERM, 2012

No. 13-7024

GREENSPRING FINANCIAL INSURANCE LIMITED, INC.,

Appellant,

v.

INTERSTATE FIRE AND CASUALTY COMPANY,

Appellee.

Appeal from the United States District Court for the District of Columbia
1:10-cv-01193-ABJ

**<u>BRIEF OF APPELLEE</u>**

Paulette S. Sarp (#351453)
psarp@hinshawlaw.com
Hinshaw & Culbertson LLP
333 South Seventh Street
Suite 2000
Minneapolis, MN 55402
612-333-3434

David Hudgins (#32072)
dhudgins@hudginslawfirm.com
Hudgins Law Firm
515 King Street, Suite 400
Alexandria, VA  22314
703-739-3300

Attorneys for Appellee Interstate Fire
and Casualty Company

## CERTIFICATE AS TO PARTIES, RULES AND RELATED CASES

## PARTIES AND CORPORATE DISCLOSURE STATEMENT

Appellee Interstate Fire and Casualty Company ("Interstate") is the only Plaintiff who appeared before the United States District Court for the District of Columbia in Civil Action No. 10-1193 (ABJ).  Interstate is an indirect subsidiary of Fireman's Fund Insurance Company.  Fireman's Fund, a California corporation, is a wholly owned subsidiary of Allianz Global Risks US Insurance Company, a California corporation.  Allianz Global Risks US Insurance Company is a wholly owned subsidiary of Allianz of America, Inc., a Delaware corporation, which is a wholly owned subsidiary of Allianz Aktiengesellschaft (Allianz AG).  Allianz AG is a publicly held company that directly holds 10% or more of Fireman's Fund Insurance Company (and its subsidiaries).

Defendants that appeared before the District Court in this matter were Washington Hospital Center Corporation, dba Washington Hospital Center; MedStar Health, Inc.; and Appellee Greenspring Financial Insurance Limited ("Greenspring").  The only defendant that is a party to this appeal is Greenspring.

## RULINGS

Greenspring seeks review of (i) the March 28, 2012 Orders (J.A. 647-667) granting Interstate's Motion for Partial Summary Judgment and denying Greenspring's Motion for summary Judgment; and (ii) the Final Order and Judgment entered on January 18, 2013 (J.A. 942-954).  These orders were all

i

entered by The Honorable Amy Berman Jackson, U.S.D.C. for the District of Columbia.  Interstate does not appeal any of Judge Jackson's rulings.

## **RELATED CASES**

This case was not previously before this Court or any other court.  Interstate is not aware of any other related cases.

## <u>TABLE OF CONTENTS</u>

CERTIFICATE AS TO PARTIES, RULES AND RELATED CASES ................... i

TABLE OF CONTENTS ......................................................................... iii

TABLE OF AUTHORITIES ................................................................... v

GLOSSARY ......................................................................................... xi

JURISDICTIONAL STATEMENT ......................................................... 1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ............................ 4

STATEMENT OF FACTS ..................................................................... 4

SUMMARY OF ARGUMENT ............................................................... 14

STANDARD OF REVIEW ................................................................... 17

ARGUMENT ..................................................................................... 18

I.    THE GREENSPRING POLICY UNAMBIGUOUSLY PROVIDES
      PROFESSIONAL LIABILITY COVERAGE TO NURSE HAND AS
      A "BORROWED" EMPLOYEE OF THE HOSPITAL. ............................ 18

      A.    The Greenspring policy provides coverage to "any employee"
            nurse of the Hospital while acting in the scope of her duties for
            the Hospital............................................................................. 18

      B.    The ordinary and common meaning of "employee" includes
            "borrowed employees" like Nurse Hand as long as the insured
            has the "right to control" them. ............................................. 22

      C.    The policy's definition of "employee" to include "all full-time
            and part-time employees" does not alter this analysis. ..................... 29

II.   GREENSPRING CANNOT MANUFACTURE AMBIGUITY IN ITS
      OWN POLICY BY REFERRING TO ITS OWN SUBJECTIVE
      "REASONABLE EXPECTATIONS." ............................................... 32

      A.    The Court should look only to the language of the Greenspring
            policy, and not extrinsic evidence, to determine whether there is
            an ambiguity. ......................................................................... 32

B.     Greenspring's belated evidence of its own subjective intent does not create an issue of fact as to the parties' "reasonable expectations" even if the term "employee" is ambiguous...................34

III.   INTERSTATE IS ENTITLED TO EQUITABLE CONTRIBUTION FROM GREENSPRING FOR THE MONIES IT PAID TO SETTLE THE LAWSUIT AGAINST NURSE HAND. ..............................................43

A.     The Greenspring policy provides primary coverage to Nurse Hand and the Interstate policy provides only excess coverage...........43

B.     Any contractual indemnity obligations that may have existed between the Hospital and Progressive are irrelevant in determining priority of coverage under the two insurance policies...............................................................................46

C.     Greenspring is obligated to reimburse Interstate for the full amount of defense and settlement amounts paid by Interstate. ..........54

CONCLUSION .........................................................................................60

REQUEST FOR ORAL ARGUMENT ................................................................60

CERTIFICATE OF COMPLIANCE.....................................................................62

CERTIFICATE OF SERVICE ............................................................................62

iv

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aetna Ins. Co. v. Fidelity & Cas. Co. of New York*,
  483 F.2d 471 (5th Cir. 1973) ...........................................................53

*Alexander v. CNA Ins., Co.,*
  657 A.2d 1282 (Pa. Super. Ct. 1995)...............................................59

*\*Alliance Syndicate, Inc. v. Parsec, Inc.*,
  741 N.E.2d 1039 (Ill. 2000) ...........................................................27

*Am. Indem. Lloyds v. Travelers Prop. & Cas. Ins. Co.*,
  335 F.3d 429, 435-36 (5th Cir. 2003);.............................................51

*American Fidelity & Cas. Co. v. Simmons*,
  253 F.3d 634 (4th Cir. 1958) ...........................................................53

*\*Anthony v. Okie Dokie, Inc.*,
  976 A.2d 901 (D.C. 2009) .........................................................23, 40

*\*Assicurazioni Generali, Spa v. Pipeline Valve Specialties Co., Inc.*,
  935 F. Supp. 879 (S.D. Tex. 1996)...................................................26

*Bonieskie v. Mukasey*,
  540 F. Supp. 2d 190 (D.D.C. 2008)...................................................38

*Bridges v. Clark*,
  59 A.3d 978 (D.C. 2013) .........................................................17, 54

*Bristol Petroleum Corp. v. Harris*,
  901 F.2d 165 (D.C. Cir. 1990)...................................................17, 54

*\*Buck v. United States Aviation Underwriters, Inc.*,
  763 F.2d 224 (6th Cir. 1985) ...........................................................26

Authorities upon which Interstate chiefly relies are marked with asterisks.

*Cameron v. USAA Property and Cas. Ins. Co.*,
733 A.2d 965 (D.C. 1999) ..............................................................18, 22, 41

*Estate of Carter v. District of Columbia*,
903 F. Supp. 165 (D.C. 1995)...........................................................26

*Chang v. U.S.*,
2007 WL 2007335 (D.D.C. July 10, 2007) .......................................26

*Chubb Ins. Co. of Canada v. Mid-Continent Cas. Co.*,
982 F. Supp. 435 (S.D. Miss. 1997) ..................................................53

*Clougherty Packing Co. v. Commissioner*,
811 F.2d 1297, 1298 n. 1 (9th Cir. 1987) .........................................36

*Cohan v. Thurston*,
292 S.E.2d 45 (Va. 1982) ..................................................................34

*Conseil Alain Aboudaram, S.A. v. de Groote*,
460 F.3d 46 (D.C. Cir. 2006)............................................................34

*Continental Cas. Co. v. Hartford Fire Ins. Co.*,
116 F.3d 932 (D.C. Cir. 1997)...........................................................43

*Crawford v. Lumbermen's Mut. Cas. Co.*,
220 A.2d 480 (Vt. 1966)....................................................................22

*Dellums v. Powell*,
566 F.2d 216 (D.C. Cir. 1977)...........................................................24

*Dippel v. Juliano*,
137 A. 514 (Md. 1927) ......................................................................25

*District of Columbia v. Hampton*,
666 A.2d 30 (D.C. 1995) ...................................................................23

*Feature Realty Litigation*,
634 F.Supp.2d 1163, 1172-73 (E.D. Wash. 2007) ...........................59

*Fields v. Office of Johnson*,
520 F. Supp. 2d 101 (D.D.C. 2007)...................................................38

*Garmany v. Mission Ins. Co.*,
  785 F.2d 942 (11th Cir. 1986) ...........................................................33

*Gen. Elec. Co. v. Jackson*,
  595 F. Supp. 2d 8 (D.D.C. 2009).......................................................38

*Green Leaves Restaurant, Inc. v. 617 H Street Associates*,
  974 A.2d 222 (D.C. 2009) .................................................................43

*Harbor Ins. Co. v. Omni Constr., Inc.*,
  912 F.2d 1520 (D.C. Cir. 1990).........................................................41

*Hartford Cas. Ins. Co. v. Mt. Hawley Ins. Co.*,
  20 Cal. Rptr. 3d 128 (Cal. Ct. App. 2004).........................................52

*Hathaway v. Tucker*,
  14 A.3d 968 (Vt. 2010).....................................................................22

*Herzog Contracting Corp. v. McGowen Corp.*,
  976 F.2d 1062, 1064 (7th Cir. 1992) ...................................................2

*Interstate Fire & Cas. Co. v. Auto-Owners Ins. Co.*,
  433 N.W.2d 82 (Minn. 1988) .............................................................53

*J. Walters Construction, Inc. v. Gilman Paper Co.*,
  620 So.2d 219 (Fla. Ct. App. 1993)....................................................53

*Jones v. Medox, Inc.*,
  430 A.2d 488, 493-94 (D.C. 1981)........................................43, 44, 45

*JPI Westcoast Construction, L.P. v. RJS & Associates, Inc.*,
  68 Cal. Rptr. 3d 91 (Cal. Ct. App. 2007)...........................................52

*Keene Corp. v. Insurance Co. of North America*,
  667 F.2d 1034 (D.C. Cir. 1981)...........................................37, 43, 45

*Legrand v. Ins. Co. of North America*,
  241 A.2d 734 (D.C. 1968) .................................................................25

*Maxum Indem. Co. v. New Jersey Iron, Inc.*,
  2010 WL 4853644 (D.N.J. Nov. 22, 2010) ........................................31

*Napolean v. Heard*,
455 A.2d 901 (D.C. 1983) ...................................................................46

*National Union Fire Ins. Co. of Pittsburg, P.A. v. Hartford Ins. Co. of Midwest*,
248 A.D.2d 78, 84 (N.Y. App. Div. 1998), *aff'd* 93 N.Y.2d 983 (N.Y. 1999)...51

*National Union Fire Ins. Co. of Pittsburgh, PA v. NGM Ins. Co.*,
2011 WL 6415484 (D.N.H. Dec. 21, 2011) ................................................50, 51

*Nationwide Mut. Ins. Co. v. Nat'l REO Mgmt, Inc.*,
205 F.R.D. 1 (D.D.C. 2000) ...................................................................19, 28

*NLRB v. Town & Country Electric, Inc.*,
516 U.S. 85 (1995) ...................................................................28

*Noble Energy, Inc. v. Salazar*,
691 F. Supp. 2d 14 (D.D.C. 2010) ...................................................................56

*Norfolk & W. Ry. Co. v. Hall*,
57 F.2d 1004 (4th Cir. 1932) ...................................................................24

*Progressive Michigan Ins. Co. v Citizens Ins. Co. of America*,
2010 WL 4483690 (Mich. Ct. App. Nov. 9, 2010) ...........................................23

*Redmond v. State Farm Ins. Co.*,
728 A.2d 1201 (D.C. 1999) ...................................................................37

*Rivera v. Prince George's County Health Dept.*,
649 A.2d 1212 (Md. Ct. App. 1994) ...................................................................24

*RLI Ins. Co. v. Agency of Transp.*,
762 A.2d 475 (Vt. 2000) ...................................................................22

*Rossmoor Sanitation, Inc. v. Pylon, Inc.*,
532 P.2d 97 (Cal. 1975) ...................................................................52, 53

*S.E.C. v. Homa*,
514 F.3d 661, 664 n. 1 (7th Cir. 2008) ...................................................................2

*Safeway Stores, Inc. v. Kelly*,
448 A.2d 856 (D.C. 1982) ...................................................................24

*Schneider v. Continental Cas. Co.*,
989 F.2d 728 (4th Cir. 1993) ...............................................................34

*Sigmund v. Progressive Northern Ins. Co.*,
374 F.Supp.2d 33, 36 (D.C. Cir. 1980).......................................33, 46

*Smalls v. State Farm Mut. Auto. Ins. Co.*,
678 A.2d 32 (D.C. 1996) .................................................................33

*St. Mary's Health Ctr. v. Bowen*,
821 F.2d 493 (8th Cir. 1987) .............................................................2

*St. Paul Fire and Marine Ins. Co. v. American International Specialty Lines Ins.
Co.*, 365 F.3d 263 (4th Cir. 2004)...............................................48, 49

*State v. Signo Trading Intern., Inc.*,
612 A.2d 932 (N.J. 1992) .................................................................36

*TMG II v. United States*,
1 F.3d 36 (D.C. Cir. 1993).................................................................46

*Travelers Cas. & Surety Co. v. Am. Equity Ins. Co.*,
113 Cal. Rptr. 2d 613 (Cal. Ct. App. 2002)......................................52

*Travelers Indem. Co. of Illinois v. United Food & Commercial Workers Int'l
Union*, 770 A.2d 978 (D.C. 2001) .......................................18, 22, 35

*\*Travelers Property Cas. Co. of America v. Liberty Mut. Ins. Co.*,
444 F.3d 217 (4th Cir. 2006) ...............................................46, 47, 48

*Tsintolas Realty Co. v. Mendez*,
984 A.2d 181 (D.C. 2009) .................................................................33

*Unkelsbee v. Homestead Fire Ins. Co. of Baltimore*,
41 A.2d 168, 170 (D.C. 1945) .........................................................18

*USF&G Co. v. CNA Ins. Cos.*,
208 A.D.2d 1163 (N.Y. App. Div. 1994) .........................................51

*Wal-Mart Stores, Inc. v. RLI Ins. Co.*,
292 F.3d 583 (8th Cir. 2002) ................................. 16, 46, 48, 49, 50, 51, 52, 53

*Washington Props., Inc. v. Chin, Inc.*,
760 A.2d 546 (D.C. 2000) ...................................................................32

*Western Exterminating Co. v. Hartford Acc. and Indem. Co.*,
479 A.2d 872 (D.C.1984) ....................................................................36

*Western Marine & Salvage Co. v. Ball*,
59 App. D.C. 208, 37 F.2d 1004 (D.C. Cir. 1930) .............................25

*Western World Ins. Co. v. Spevco, Inc.*,
671 N.E.2d 1100 (Ohio Ct. App. 1996)..............................................26

*Whiting v. AARP*,
637 F.3d 355 (D.C. Cir. 2011)............................................................33

## Statutes and Rules

D.C. Code § 28-3302(a) .........................................................................2

Fed. R. App. P. 34(a) ............................................................................60

## Other Authorities

*American Heritage Dictionary* 604 (3d ed. 1992)...................................28

*Black's Law Dictionary* (9th ed.) .....................................................27, 28

*Couch on Insurance,* § 129:14 (3d ed.) ................................................27

Joseph Lavitt, *Abjuring the Collateral Indemnity Exception to Insurer*
*Contribution*, 56 Wayne L. Rev. 1333, 1352-53 ................................48

*Labor Force Statistics from the Current Population Survey, U.S. Bureau of Labor*
*Statistics*, http: www.bls.gov.cps/lfcharacteristics .............................29

*U.S. Census Bureau*, http://www.census.gov/govs/definitions ..............30

# <u>GLOSSARY</u>

"J.A." means the Joint Appendix filed on September 10, 2013.

## JURISDICTIONAL STATEMENT

With one significant exception, Interstate agrees with Greenspring's jurisdictional statement. Contrary to Greenspring's statement, the district court's Memorandum Opinion and Order dated March 28, 2012 did not award summary judgment in Interstate's favor on liability only, but both liability and damages. (J.A. 647-667).

This is relevant to Interstate's argument that Greenspring waived the right to assert the argument it now raises as Issue No. 4 in its Brief because it did not raise this argument in a timely manner. Interstate's Motion for Partial Summary Judgment and supporting memorandum requested judgment on both liability and damages, specifically, that Greenspring was obligated to reimburse Interstate for the full $3,055,000.00 paid by Interstate to settle the malpractice claims against Nurse Chichio Hand, plus defense costs. (*See* Interstate's Memorandum in Support of Motion for Partial Summary Judgment, p. 3 ("requesting that the Court enter summary judgment that [Greenspring] is obligated to reimburse the full amount of the indemnity payment and defense expenses incurred by Interstate in defending and settling Ms. Banks' claim against Nurse Hand.")). The motion was for partial summary judgment because it did not seek summary judgment against any of the defendants other than Greenspring. As to Greenspring, Interstate sought judgment on both liability and damages.

1

Interstate also sought pre-judgment and post-judgment interest if summary judgment were awarded in its favor. Greenspring disputed Interstate's entitlement to pre-judgment interest. It was the pre-judgment issue and clarification as to the defense expenses paid by Interstate in that the district court referred to the Magistrate Judge for resolution after awarding summary judgment in Interstate's favor. (J.A. 948-51). However, Greenspring attempted to argue for the first time that even if it were liable for contribution it could not be liable for the full amount sought by Interstate. (J.A. 668-85).

The Magistrate issued a Memorandum Order awarding pre-judgment pursuant to the rate and calculation proposed by Interstate and confirming the amount of defense expenses to which Interstate was entitled. (J.A. 926-41). The district court adopted these findings and entered final judgment, concluding that Greenspring had waived its right to assert this new argument. (J.A. 943-54).

The district court awarded pre-judgment interest at the rate in D.C. Code § 28-3302(a), which is 6% per annum, from August 20, 2009 through January 18, 2013. (J.A. 942-43) Because the amount is a mechanical calculation, the judgment is final. (*Id.*) *S.E.C. v. Homa*, 514 F.3d 661, 664 n. 1 (7th Cir. 2008) (citing *Herzog Contracting Corp. v. McGowen Corp.*, 976 F.2d 1062, 1064 (7th Cir. 1992)); *St. Mary's Health Ctr. v. Bowen*, 821 F.2d 493, 498 (8th Cir. 1987) (judgment was final although damages were not quantified where calculation was

2

mechanical).   On appeal, Greenspring does not challenge the award of pre-judgment interest.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.     Did the district court correctly determine that the Greenspring policy unambiguously provides coverage for borrowed employees, like Nurse Hand, who provide medical care to the Hospital's patients while under the Hospital's control, correctly denying Greenspring's request that the court re-write its policy to exclude borrowed employees?

2.     Did the district court correctly determine that Interstate is entitled to equitable contribution from Greenspring for defense and indemnity monies paid by Interstate in defending their common insured (Nurse Hand) based upon the plain language of the policies' "other insurance" provisions, correctly denying Greenspring's request that the court re-write its policy to provide otherwise?

3.     Did the district court correctly determine that Greenspring is obligated to reimburse Interstate for the full amount that Interstate paid to defend and settle the claims against Nurse Hand, correctly rejecting as untimely and speculative Greenspring's argument that some portion of this amount "must have been" to resolve other claims?

## STATEMENT OF FACTS

**The relationship between Progressive, the Hospital, and Nurse Hand.**

Progressive Nursing Staffers of Virginia, Inc. ("Progressive") is in the business of providing nurses to hospitals to work on a temporary basis. (J.A. 486) Progressive does not directly provide health care to patients of its own; rather,

4

Progressive provides nurses to healthcare facilities to use in the operation of their facilities.  (J.A. 487).

Progressive entered into a temporary staffing agreement with Washington Hospital Center ("the Hospital") that was in effect on April 6, 2004 – the date that Nurse Hand allegedly committed malpractice while caring for a patient at the Hospital.  (J.A. 47-60; 487).  Nurse Hand had contacted the Hospital directly that morning to inquire as to whether the Hospital needed nursing assistance that day. (J.A. 488).  It was not unusual for an agency nurse and the Hospital to contact each other directly to schedule an assignment when a relationship had developed between the nurse and the Hospital.  (J.A. 488).

Progressive paid its agency nurses directly, provided workers compensation insurance, and withheld taxes from their paychecks.   However, the Hospital reimbursed Progressive for the time worked by Progressive's nurses based upon the number of hours worked by the nurse.  (J.A. 494-95).

**The Hospital retained the right to control and terminate Nurse Hand and to dictate her credentials.**

The Hospital retained the right to control agency nurses with regard to their work at the Hospital pursuant to the following provisions of the Agreement:

### Article III: Responsibilities of HOSPITAL

* * *

B.      HOSPITAL will provide an orientation to the Registered Nurses.   HOSPITAL will also maintain responsibility for clinical

<u>supervision and direction of PROGRESSIVE Registered Nurses with</u> <u>regard to day to day staffing and nursing objectives</u>.  The Hospital will compensate PROGRESSIVE at a discounted rate of $60 per hour for up to twenty-four (24) hours spent by a per diem Registered Nurse in orientation.

C.     <u>HOSPITAL will provide written evaluations for each</u> <u>Registered Nurse based upon the HOSPITAL job description</u> and will forward a copy of such evaluation at the end of each assignment.  If the HOSPITAL believes that the performance of a Registered Nurse needs improvement, but HOSPITAL wishes to retain the services of the Registered Nurse, an appropriate nurse manager may contact PROGRESSIVE'S nurse recruiter or manager to discuss improvement expectations.

D.     <u>HOSPITAL may immediately terminate the services of a</u> <u>Registered Nurse who fails to perform within the reasonable</u> <u>expectations of HOSPITAL or fails to follow HOSPITAL policies for</u> <u>patient care</u>.  (emphasis added.)

(J.A. 49-50).  Agency nurses and nurses employed directly by the Hospital have the same duties as it relates to providing medical care to patients, for example, both are required to follow the plan of care that was developed by that patient's physician.  (J.A. 490).

Progressive agreed to provide the Hospital with nurses "who have met the credentialing and hiring standards as established by Progressive <u>and the Hospital</u>, and as required by law."  (emphasis added).  (J.A. 490).  The Hospital's "Policy Governing Commercial Agency Registered Nurses" identifies "core educational requirements" the Hospital expects its agency nurses to meet and requires them to "follow all hospital/divisional/unit clinical and administrative policies and

procedures"; "follow divisional/unit standard of care and practice"; and even to adhere to the Hospital's "Standards for Dress and Appearance." (J.A. 491).

The Hospital requires agency nurses to complete an orientation that includes "on the job orientation" and "self-learning packets" before they are cleared to work at the Hospital. (J.A. 488, 491). These self-learning packets include "awareness and reporting of patient abuse"; "emergency management"; "patient rights"; and "security management." (J.A. 492). Several of these packets expressly state that their purpose is to provide proper direction and training "to employees" of the Hospital. (emphasis added) (J.A. 492-493). Only if the nurse successfully completes this orientation and meets the Hospital's standards is the nurse allowed to work at the Hospital. (J.A. 491).

Nurse Hand was required to demonstrate to the Hospital's managing nurse that she was capable of completing the tasks set forth on the "Obstetrics Agency Nurse" and "Labor and Delivery Agency Nurse" orientations skills checklists. (J.A. 493). Nurses working in labor and delivery also must follow the Hospital's "Delivery Suite Policies," the Hospital's "Epidural Anesthesia" guidelines, and "Standard Practices" regarding pain management. (J.A. 493).

At the time, the Hospital regularly conducted evaluations in order to determine whether the agency nurse was "operating within the [Hospital's] scope of practice or the standards of care" and "had the correct attitude and behavior" in

7

dealing with patients.  (J.A. 488, 494)).  The Hospital also retained authority to demand that an agency nurse immediately leave the premises if the nurse was not performing consistently with the Hospital's guidelines.  (J.A. 488, 494).

**The Hospital has admitted for purposes of this litigation that Nurse Hand was working as its "borrowed servant".**

In response to Requests for Admission served by Interstate, the Hospital admitted that Nurse Hand was acting as the "borrowed servant" of the Hospital at the time of the incident involving Radianne Banks on April 6, 2004.  (J.A. 339-43; 496-97).  Greenspring also concedes that Nurse Hand was under the direct control and supervision of the Hospital when she allegedly committed malpractice.  (Brief p. 20).

**The Underlying Action and settlement of the claims against Nurse Hand.**

On March 19, 2007, Radianne Banks filed a complaint against the Hospital and two doctors it employed in the Superior Court for the District of Columbia (the "Underlying Action").  (J.A. 497).  Ms. Banks alleged that the Hospital and its employees negligently provided care with regard to a C-Section she underwent on April 6, 2004 and that she was partially paralyzed as a result.  (J.A. 497).

The Hospital filed a third-party complaint against Nurse Hand and Progressive, asserting claims for contribution and indemnification.  (J.A. 497).  The Hospital alleged that Ms. Banks' injuries were sustained <u>solely</u> as a proximate result of Nurse Hand's conduct and that Progressive was vicariously liable for

Nurse Hand's conduct based upon respondeat superior. (J.A. 497-98). The Hospital did not allege any independent negligence on the part of Progressive. (*Id.*) Hand and Progressive subsequently filed a fourth-party complaint against the Hospital alleging contribution and indemnification. (J.A. 498). Ms. Banks later amended her complaint to add Nurse Hand and Progressive as direct defendants. (Greenspring's Brief at 9).

On or about August 14, 2009, Ms. Banks entered into a settlement agreement and release with the Hospital, Progressive and Nurse Hand whereby Ms. Banks agreed to dismiss her malpractice claims against all parties in exchange for payment of the total sum of $4,105,000.00. (J.A. 367-78). Interstate paid Ms. Banks $3,055,000.00 to release Nurse Hand and Progressive. The Hospital paid Ms. Banks $1,050,000.00 to release the Hospital and its doctors. (*Id.*) The Hospital, Progressive and Nurse Hand released all contribution and indemnification claims among themselves. (*Id.*) However, the settlement agreement also includes the following "carve-out" provision:

> Nothing contained in this Agreement should be construed as a waiver of [Interstate's] rights under its policies to seek reallocation of the settlement. The Hospital agrees and understands that IFCC does not waive and expressly reserves the right to rely on the "other insurance" clauses incorporated into its policies to seek reallocation of the settlement as may be warranted.

(J.A. 369).

Interstate incurred and paid defense counsel $148,062.00 in attorneys' fees and $5,1876.75 in costs/expenses in defending the Underlying Action. (J.A. 934, 499).

**The Greenspring policy provides primary professional liability coverage to nurse employees.**

Greenspring issued a "Primary Healthcare Providers Professional and General Liability, Managed Care Errors and Omissions, and Employment Practices Liability" policy to named insured Medstar Health Inc. for the policy period July 1, 2003 to July 1, 2004, policy no. 1-12704-00-03. (J.A. 382-426; 499). It provides a limit of liability for "each medical incident" that exceeds the $3,055,000 sought by Interstate. Interstate has not stated the specific limit here because this information has been filed under seal at Greenspring's request. The limit can be verified at J.A. 386 in the Supplemental Joint Appendix filed under seal.

The Greenspring policy provides "professional liability" coverage through the following insuring agreement:

Part 1 – Professional Liability

    I.    Insuring Agreement

    To indemnify the Insured for all sums that the Insured shall become legally obligated to pay as Damages as result of Injury to any person arising out of a covered Medical Incident occurring during the policy period and within the Policy Territory.

(J.A. 387).

The Greenspring policy includes the following definition of "Insured":

**Insured** means any person or organization qualifying as an Insured under the "Persons **Insured**" provisions of Part 1 and 2 of this policy. Insurance afforded applies separately to each **Insured** against whom **Claim** is made or suit it brought except with respect to the limits of the Company's liability.  (emphasis original.)

 (J.A. 400).  The "Persons Insured" section lists the following as insureds:

(D)    any employee other than a Physician, Podiatrist, Dentist, medical or dental intern or resident of a Named Insured while acting within the scope of his or her duties as such for a Named Insured.

(E)    any licensed Physician, Podiatrist, or Dentist for whom a Named Insured has elected to provide coverage.

\*   \*   \*

(H)    any medical or dental resident, intern, or fellow for whom a Named Insured has elected to provide coverage and who is named on the schedule of Insured residents, interns, or fellows submitted by such Named Insured while acting within the scope or course of his or her professional employment with a Named Insured; or a program of approved medical instruction by a Named Insured.  (emphasis added.)

(J.A. 387-88).  The Hospital is a wholly-owned subsidiary of the Named Insured Medstar and therefore qualifies as a "Named Insured" under the Greenspring policy.  (J.A. 500).

The term "employee" is defined in the Greenspring policy to "mean all past, present, or future full-time or part-time Employees of the Named Insured including subsidiaries of the Named Insured."  (J.A. 400).

The Greenspring policy incorporates the following "other insurance" clause:

**X.    Other Insurance**

11

> The insurance afforded by this policy is primary insurance, except when stated to apply in excess of or contingent upon the absence of other insurance. When this insurance is primary and the ***Insured*** has other insurance that is stated to be applicable to the loss on an excess or contingent basis, the amount of the Company's liability under this policy shall not be reduced by the existence of such other insurance.
>
> \* \* \*
>
> However, with respect to coverage afforded by this policy as it may apply to ***Employees***, this insurance is designated primary and the foregoing provision contained in this section shall not apply. (underline emphasis added.)

 (J.A. 408-09).

**The Interstate policies provide coverage to Nurse Hand that is *excess* over the primary coverage provided by Greenspring.**

Interstate issued two policies to Progressive Nursing Staffers of Virginia, Inc., one of which was a first-layer "claims made" professional liability policy, policy number ASC 1000502. The other policy was an excess commercial liability coverage through policy number XSP1100184. (J.A. 503). Nurse Hand qualifies as an insured under the Interstate policies.

Interstate's first-layer policy was subject to a $1,000,000 limit of liability per incident. (J.A. 429-53). The first-layer policy includes an excess "other insurance" provision, which provides in pertinent part as follows:

> D.    OTHER INSURANCE:    If there is other valid insurance (whether primary, excess, contingent or self-insurance) which may apply against a loss or claim covered by this policy, the insurance

<u>provided hereunder shall be deemed excess insurance over and above
the applicable limit of all other insurance or self-insurance.</u>

When this insurance is excess, the Company shall have no duty under
this policy to defend any **Claim** or **Suit** that any other insurer or self-
insurer has a duty to defend.  If such other insurer or self-insurer
refuses to defend such **Claim** or **Suit**, the Company shall be entitled
to the **Insured's** rights against all such other insurers or self-insurers
for any **Claims Expenses** incurred by the Company. … (underline
emphasis added.)

(J.A. 450).  Pursuant to this provision, the Greenspring primary policy is "other
insurance" that must be exhausted before any payment is required under Interstate's
first-layer professional liability policy.

Interstate's excess commercial liability policy was subject to a $4,000,000
limit of liability and includes the following "other insurance" provision:

**K.    OTHER INSURANCE**

If there is any (1) **Other Insurance**, or (2) insurance available
to the **Insured** on an extended reporting period basis under
either a **Primary policy** or **Other Insurance**, or (3) insurance
available to the **Insured** on a retroactive basis under either a
**Primary Policy** or **Other Insurance**, this policy shall apply as
excess of and not contributory with such insurance. …
(emphasis original.)

(J.A. 479).  These provisions require that the Greenspring primary policy must be
exhausted before any payment is required under the Interstate excess commercial
liability policy.

13

## SUMMARY OF ARGUMENT

The sole claim at issue in this appeal is one for equitable contribution by one insurer (Interstate) against another insurer (Greenspring) for monies that Interstate incurred in defending and indemnifying Nurse Chichio Hand in the Underlying Action. Nurse Hand was an insured under the policies issued by Interstate and Greenspring but whose coverage under the Interstate policies was only *excess* over Greenspring's coverage. There are no pending or possible future claims for contractual indemnity between Progressive, Nurse Hand or the Hospital. These claims were all released as part of the settlement of the Underlying Action. The only claim that was carved out of this settlement was Interstate's claim for equitable contribution. The settlement agreement expressly reserved Interstate's right to seek reallocation of the settlement payment it made pursuant to the "other insurance" provisions in the Interstate and Greenspring policies.

The district court correctly determined that Interstate was entitled to summary judgment based upon the unambiguous terms of the insurance policies at issue. For example, the Greenspring policy broadly applies to "any employee" while acting within the scope of her duties for the Hospital. It is undisputed that Nurse Hand was acting within the scope of her duties for the Hospital when she allegedly committed malpractice. Greenspring seeks to avoid the plain language of its own policy by arguing that the term "employee" should not include borrowed or

leased employees like Nurse Hand. Greenspring does not cite a single case holding that the plain and ordinary meaning of "employee" does not include borrowed or leased employees, nor does it make any effort to address the numerous cases cited by Interstate confirming that "employee" *does* include these types of workers.

If Greenspring had wanted to exclude borrowed employees from coverage under its policy, it easily could have written this exception into its policy. It did not do so. The district court properly rejected Greenspring's request that the court re-write its policy to include this exception. The district court also was correct in rejecting Greenpring's efforts to create ambiguity *in its own policy* by submitting a declaration from Greenspring's president attesting to Greenspring's "intention" that borrowed employees not be covered. Greenspring is not entitled to refer to extrinsic evidence in an attempt to create and then resolve ambiguity in policy language that it drafted.

Having properly determined that Nurse Hand was a covered "employee" of the Hospital, the district court then applied the plain language of the policies' "other insurance" provisions and held that Interstate's coverage was excess over the Greenspring policy. Greenspring does not dispute that based upon the language included in its own policy, its policy is primary. However, Greenspring again asks this Court to ignore the language it drafted and look to extrinsic evidence such as

15

the indemnity provisions in the Temporary Staffing Agreement to determine priority of coverage.  There is no authority in the District of Columbia that would allow this Court to disregard the unambiguous terms of the policies' "other insurance" provisions.  Other jurisdictions that have applied the so-called "*Wal-Mart*" rule limit its application to situations where there is a conflict between the "other insurance" provisions (e.g. both are excess or both are primary) or there are ongoing contractual indemnity claims asserted between insured that need to be resolved.  Neither of these circumstances exist here.

Finally, Greenspring seeks to avoid payment for the full amount of the $3,055,000 by arguing that some unspecified portion of this amount must have been paid on behalf of Progressive, which is not insured under the Greenspring policy.  The trial court properly rejected this argument as untimely because Greenspring did not raise it until after summary judgment had been awarded in Interstate's favor.  The trial court also held that even if timely, this argument lacked merit because there was no independent claim of negligence against Progressive, rather, only vicarious liability for Nurse Hand's negligence.  Greenspring also argued that some of these monies "must have been" paid by Interstate to release the Hospital's indemnity claim against Progressive.  The trial court properly concluded that Greenspring had produced no competent evidence to support this allocation, particularly when the settlement agreement itself included no allocation.  The trial

16

court correctly declined Greenspring's invitation to re-write the settlement agreement in order to support its position in this lawsuit.

For four years now, Greenspring has avoided payment of the $3,055,000 it rightfully owes for the defense and settlement of claims against its insured, Nurse Hand. Interstate respectfully requests that this Court affirm judgment in its favor and order Greenspring to finally satisfy its obligation to Interstate.

## STANDARD OF REVIEW

With the exception of one issue, the correct standard of review in this matter is *de novo*. However, the abuse of discretion standard of review should apply to the district court's determination that Greenspring waived the right to claim that, if Greenspring is obligated to reimburse Interstate pursuant to the policies' "other insurance" provisions, it is only obligated to pay for some unspecified portion of the $3,055,000 settlement payment made by Interstate. The district court correctly determined and did not abuse its discretion that Greenspring waived this argument because it was not raised until after discovery was closed, the parties had fully briefed their motions for summary judgment, and summary judgment had been granted in Interstate's favor. This determination is subject to an abuse of discretion standard of review. *See Bristol Petroleum Corp. v. Harris*, 901 F.2d 165, 284 (D.C. Cir. 1990); *Bridges v. Clark*, 59 A.3d 978 (D.C. 2013).

## **ARGUMENT**

### I. THE GREENSPRING POLICY UNAMBIGUOUSLY PROVIDES PROFESSIONAL LIABILITY COVERAGE TO NURSE HAND AS A "BORROWED" EMPLOYEE OF THE HOSPITAL.

Courts first look to the language of the insurance policy itself to determine coverage. If a term is not adequately defined as it relates to a specific situation, courts will look to the ordinary and common meaning of the term. *Travelers Indem. Co. of Illinois v. United Food & Commercial Workers Int'l Union*, 770 A.2d 978, 986 (D.C. 2001); *Cameron v. USAA Property and Cas. Ins. Co*., 733 A.2d 965, 970 (D.C. 1999) ("words used [in an insurance policy] should be given their common, ordinary, and it has been said their 'popular' meaning") (quoting *Unkelsbee v. Homestead Fire Ins. Co. of Baltimore*, 41 A.2d 168, 170 (D.C. 1945)). As set forth more fully below, in determining the ordinary or common meaning of a policy term, courts will consider dictionary definitions and case law or "common law" interpreting similar language. Here, the district court examined all of these factors and correctly concluded that Nurse Hand was entitled to coverage under the Greenspring policy as a borrowed employee of the Hospital.

### A. The Greenspring policy provides coverage to "any employee" nurse of the Hospital while acting in the scope of her duties for the Hospital.

The plain language of the Greenspring policy includes coverage for "any employee" other than physicians, dentists, podiatrists and interns while acting in the course of her duties for the Hospital. The Greenspring policy broadly defines

"employee" to include "all past, present, or future full-time or part-time Employees of the Named Insured." Nowhere does the Greenspring policy does not exclude from coverage nurse employees who may have been borrowed or leased from a staffing agency. Greenspring, as a captive insurer for the Hospital, easily could have included this exception in its policy if it wished to do so but it did not. Greenspring is precluded from now asking this Court to re-write its policy to include this exclusion from coverage. *Nationwide Mut. Ins. Co. v. Nat'l REO Mgmt, Inc.*, 205 F.R.D. 1, 11 (D.D.C. 2000) ("the court cannot supply limits that are unsupported by the language of the contract").

The Greenspring policy provides in pertinent part as follows:

III.    <u>Persons Insured</u>

                    *   *   *

(D)     *any employee* other than a Physician, Podiatrist, Dentist, <u>medical or dental intern or resident of a Named Insured while acting within the scope of his or her duties as such for a Named Insured</u>.

(E)     any licensed Physician, Podiatrist, or Dentist for whom a Named Insured has elected to provide coverage.

                    *   *   *

(H)     any medical or dental resident, intern, or fellow for whom a Named Insured has elected to provide coverage and who is named on the schedule of Insured residents, interns, or fellows submitted by such Named Insured while acting within the scope or course of his or her professional employment with a Named

19

> Insured; or a program of approved medical instruction by a
> Named Insured.  (emphasis added.)

(J.A. 387-388).  The term "employee" is defined (albeit somewhat circuitously) to

mean "all past, present, or future full-time or part-time Employees of the Named

Insured including subsidiaries of the Named Insured."  (J.A. 400).  Nowhere does

the Greenspring policy state that borrowed employees, leased employees, or

temporary employees are not included within the definition of "employee."

Nurse Hand qualifies as a "Persons Insured" pursuant to Section III(D) of

the "Persons Insured" portion of the Greenspring policy because she was working

within the scope of her duties as a nurse "employee" of the Hospital at the time of

the incident involving Ms. Banks.

Notably, although the Greenspring policy broadly applies to nurse

"employees" and includes no exceptions, the policy does include specific

requirements and exceptions as to doctors and interns.  The policy makes a clear

distinction between when a *nurse* is insured under the Greenspring policy versus

when *doctors/interns* are insured under the Greenspring policy.  Pursuant to these

definitions, a doctor who might also be an "employee" of the hospital is covered

under the Greenspring policy only if the Named Insured has "specifically elected to

provide coverage" to that doctor.  *See* Subsection III.E. of the definition at J.A.

388.  However, there is no requirement under Subsection III.D that the Named

Insured must "specifically elect to provide coverage" for its nurse employees.  (*Id.*)

20

Rather, nurse employees are automatically covered as long as they are working within the scope of their employment. Doctors and interns, on the other hand, are only covered (even if otherwise "employees") if there is, for example, an endorsement that specifically names them as insureds. The Greenspring policy does include endorsements that name specific doctors as insureds and require payment of a specified "additional premium" for such coverage. (J.A. 426).

Accordingly, Greenspring's argument that Nurse Hand is not an insured under the Greenspring policy because she did not pay any premium or negotiate the terms of the policy or only qualifies as a "borrowed employee" as opposed to a "regular employee" misses the mark. There is no requirement in the policy that Nurse Hand be involved in negotiating the policy or contribute toward the premiums in order to be entitled to coverage as an additional insured. There also is no evidence in the record as to whether or not Greenspring would have charged a higher premium to the Hospital if it had intended to cover borrowed employees.

The fact that the Greenspring policy goes to great lengths to specifically state the circumstances under which a doctor or intern "employee" will be covered but includes no such limitations as to nurse "employees" highlights and confirms that as long as a borrowed nurse is acting within the scope of her employment – as Nurse Hand was doing – she is a covered employee.

21

**B.    The ordinary and common meaning of "employee" includes "borrowed employees" like Nurse Hand as long as the insured has the "right to control" them.**

If and an insurer fails to adequately define a term used in its policy, the Court will look to the ordinary and common meaning of the term. *Travelers Indem. Co. of Illinois v. United Food & Commercial Workers Int'l Union*, 770 A.2d 978, 986 (D.C. 2001). *See also Cameron v. USAA Property & Cas. Inc. Co.*, 733 A.2d 965, 970 (D.C. 1999) ("[W]ords used [in an insurance policy] should be given their common, ordinary, and it has been said their 'popular' meaning") (quoting *Unkelsbee v. Homestead Fire Ins. Co. of Baltimore*, 41 A.2d 168, 170 (D.C. 1945)).

Courts across the country that have been called upon to apply the ordinary and common meaning of the term "employee" consistently have held that it is appropriate to look to the state's common law doctrines governing the employer-employee relationship – such as the "right to control" test – to determine the "ordinary" meaning of "employee" as used in an insurance policy. *See Hathaway v. Tucker*, 14 A.3d 968 (Vt. 2010) (applying common law analysis to determine who qualified as "employee" for purposes of insurance coverage); *RLI Ins. Co. v. Agency of Transp.*, 762 A.2d 475, 477 (Vt. 2000) (construing "employee" as used in an insurance policy according to its ordinary meaning and applying the common law on the "right to control" test to decide this issue); *Crawford v. Lumbermen's*

22

*Mut. Cas. Co.*, 220 A.2d 480, 583 (Vt. 1966) (construing the term "employee" in an insurance policy according to the "right to control" test); *Progressive Michigan Ins. Co. v Citizens Ins. Co. of America*, 2010 WL 4483690 at *2 (Mich. Ct. App. Nov. 9, 2010) (same). As the district court correctly pointed out, it makes sense to apply the common law "right to control" test because this test is designed to get to the heart of the issue in this case – whether an employer (special or otherwise) has sufficient right to control a worker so that the employer can be held liable for the worker's torts. If so, then the employer's liability coverage for acts of its employees should apply to provide coverage.

In contrast, Greenspring cites to no case law holding that it is not appropriate to consider the "right to control" test in determining the ordinary meaning of the term "employee." Greenspring's criticism of the district court for considering the common law "right to control" test is without authority and entirely unfounded.

The District of Columbia courts apply the so-called "right to control" test in determining whether someone qualifies as an "employee," borrowed or otherwise. *See, e.g., District of Columbia v. Hampton*, 666 A.2d 30, 38-39 (D.C. 1995) (the "determinative factor" is the "right to control an employee in the performance of a task and its result and not the actual exercise of control or supervision"); *Anthony v. Okie Dokie, Inc.*, 976 A.2d 901, 906 (D.C. 2009) (nothing that the "determinative factor" in determining employee status is the "right to control an

employee in the performance of a task and in its result, and not the actual exercise of control or supervision").  Greenspring does not dispute that the Hospital had the right to control Nurse Hand's conduct in providing care to the Hospital's patients. (Greenspring's Brief p. 20).

"The law of agency is clear that a person generally the servant of one master can become a 'borrowed' servant of another."  *Dellums v. Powell*, 566 F.2d 216, 220 (D.C. Cir. 1977).  "If the borrowed servant commits a tort while carrying out the bidding of the borrower, vicarious liability for that tort attaches to the borrower and not to the general master."  *Id.; Safeway Stores, Inc. v. Kelly*, 448 A.2d 856, 861 (D.C. 1982) (an employee who is "borrowed" from his or her general employer also will qualify as an employee of the borrower if the borrower maintains sufficient control over the borrowed employee's conduct); *see also Norfolk & W. Ry. Co. v. Hall*, 57 F.2d 1004, 1008 (4th Cir. 1932) ("A servant furnished by his general employer to perform a particular service for another under the latter's control is to be dealt with as the servant of the latter and not of the former.  The special employer bears, not only the liability to third persons for injuries caused by the servant's negligence, but also the liability to the servant for injuries suffered by him from the neglect to perform the duties owed him by his master."); *Rivera v. Prince George's County Health Dept.*, 649 A.2d 1212, 1224 (Md. Ct. App. 1994) ("[W]here the work to be done is the borrower's work,

24

and a part of his business, and he has the power and authority to direct when and where and how it shall be done, and where the work is not within the scope of the general employment of the servant, it may fairly be said that so far as that work is concerned he is under the control of the borrower and that the latter will be responsible for his negligent acts."); *Western Marine & Salvage Co. v. Ball*, 59 App. D.C. 208, 37 F.2d 1004, 1006-07 (D.C. Cir. 1930) (crane operator furnished with crane to buyer of scrap iron to do buyer's work was held to be "employee" of buyer even though buyer did not directly pay the crane operator – right to control was determinative); *Legrand v. Ins. Co. of North America*, 241 A.2d 734, 735 (D.C. 1968) (fact that contractor did not pay painter directly did not alter fact that contractor had the power to control and to dismiss painter from house-painting job and therefore qualified as painter's employer). The reasoning for the "borrowed servant" rule is obvious: It would be "unreasonable and illogical to hold the general employer liable for the acts of his servants in the performance of a duty which had been ordered and directed by the borrower, and which the general employer had not the power either to direct, control or prevent." *Dippel v. Juliano*, 137 A. 514, 516 (Md. 1927).

Even if Nurse Hand remained in the "general employment" of Progressive while she provided healthcare to the Hospital's patients, this does not alter the fact that she was under the control of the Hospital while caring for its patients and,

25

therefore, in the "special employment" of the Hospital.  The Hospital has admitted this fact.  (J.A. 339).  It is well-established that an employee like Nurse Hand may be an employee of two employers at the same time.  *See Chang v. U.S.,* 2007 WL 2007335 at *12 (D.D.C. July 10, 2007) ("A person may be the servant of two masters, not joint employers, at one time as to one act, if the service to one does not involve the abandonment of service to the other", citing Restatement (Second) of Agency § 226); *see also Estate of Carter v. District of Columbia*, 903 F. Supp. 165, 167 (D.C. 1995).

Consistent with the well-recognized concept of a "borrowed employee," courts across the country have interpreted the term "employee" as used in a liability insurance policy to include borrowed or temporary employees like Nurse Hand.  *See Buck v. United States Aviation Underwriters, Inc.*, 763 F.2d 224, 226-28 (6th Cir. 1985) (rejecting argument that pilot did not qualify as an insured "employee" under helicopter owner's liability policy because he was only a "borrowed employee"  and  holding "[t]he District Court erred in reading the policy term "employee" to apply only to "regular employees" and not "borrowed employees"); *Western World Ins. Co. v. Spevco, Inc.,* 671 N.E.2d 1100, 1103 (Ohio Ct. App. 1996) (temporary employee who was provided to insured by personnel agency and was under control of insured was  insured's "employee" for purposes of coverage exclusion); *Assicurazioni Generali, Spa v. Pipeline Valve*

26

*Specialties Co., Inc.,* 935 F. Supp. 879, 887 (S.D. Tex. 1996) (the "right to control" is the "critical factor" in establishing an employment relationship and holding that worker was "at the very least, a 'dual employee' or working for Pipeline as a 'borrowed employee,'" at "least for the purpose of interpreting the insurance contract terms"); *Alliance Syndicate, Inc. v. Parsec, Inc.*, 741 N.E.2d 1039, 1048 (Ill. 2000) ("employee" unambiguously included "borrowed servants" for purposes of insurance coverage); *see also Couch on Insurance,* § 129:14 (3d ed.) (because "an employee who is directed to or permitted to perform services for another 'special' employer may become that special employer's employee while performing services" an "employee exclusion in the special employer's commercial general liability policy is therefore applicable to the borrowed employee.").

As the foregoing demonstrates, Greenspring's argument that the district court improperly considered the "right to control" test in determining the ordinary and common meaning of the term "employee" in Greenspring's policy is without merit. Greenspring ignores all of these cases in its Brief.

In addition to case law authority, Black's Law Dictionary (9th ed.) specifically includes "borrowed employee" within the definition of the term "employee":

> **borrowed employee**.  See EMPLOYEE.
> **borrowed servant.**  See borrowed employee under EMPLOYEE.

27

**Employee**.  (1822) A person who works in the service of another person (the employer) under an express or implied contract of hire, under which the employer has the right to control the details of work performance. – Also spelled *employe*.  Cf. AGENT (1); INDEPENDENT CONTRACTOR.  [Cases:  Labor and Employment ⌐ 23.]

***borrowed employee***.  (1923) An employee whose services are, with the employee's consent, lent to another employer who temporarily assumes control over the employee's work.  • Under the doctrine of respondeat superior, the borrowing employer is vicariously liable for the borrowed employee's acts.  But the borrowing employer may also be entitled to assert immunity under workers'-compensation laws.  – Also termed *borrowed servant; loaned employee; loaned servant; employee pro hac vice; special employee*.  See RESPONDEAT SUPERIOR.  [Cases:  Labor and Employment ⌐ 26; Workers' Compensation ⌐ 202.] …

There is no exception in this definition of "employees" or in other contemporary dictionaries for "borrowed employees."  *See, e.g., American Heritage Dictionary* 604 (3d ed. 1992) (broadly defining employee as any "person who works for another in return for financial or other compensation*"); NLRB v. Town & Country Electric, Inc.*, 516 U.S. 85, 90 (1995) (consulting Black's Law Dictionary when defining "employee" or purposes of the National Labor Relations Act).

Simply put, if Greenspring had wanted to exclude borrowed or leased employees from coverage under its policy, it easily could have written such exceptions into the policy.  Greenspring failed to do so, and it cannot ask this Court to write these additional requirements into its policy.  *Nationwide Mut. Ins. Co. v.*

*Nat'l REO Mgmt, Inc.*, 205 F.R.D. 1, 11 (D.D.C. 2000) ("the court cannot supply limits that are unsupported by the language of the contract").

### C.     The policy's definition of "employee" to include "all full-time and part-time employees" does not alter this analysis.

Greenspring unsuccessfully argues that because its policy defines "employee" to include "all past, present, or future full-time or part-time Employees," that it has effectively excluded borrowed employees from this definition. Greenspring concludes without citation to any legal authority that "full-time" and "part-time" cannot include borrowed employees.

Instead, Greenspring cites to publications from the U.S. Census Bureau and the U.S. Bureau of Labor Statistics. It is not appropriate to consider these publications (as opposed to dictionaries) when determining the ordinary meaning of the term "employee." However, even if properly considered, they do not support Greenspring's position. For example, Labor Bureau definition cited by Greenspring simply states that "full time is 35 hours or more per week; part time is 1 to 34 hours per week". *Labor Force Statistics from the Current Population Survey, U.S. Bureau of Labor Statistics*, http: www.bls.gov.cps/lfcharacteristics. Greenspring argues that this definition requires a worker to have an "established schedule" in order to qualify as an employee, but this is not what the definition states. A borrowed employee could fall within either one of these definitions depending upon the number of hours worked.

Greenspring's citation to portions of the Census Bureau's definitions of "full-time" and "part-time" employees also misses the mark. These definitions state in their entirety as follows:

> **Full-Time Employees** – Persons employed during the pay period to work the number of hours per week that represents regular full-time employment. <u>Included are full-time temporary or seasonal employees who are working the number of hours that represent full-time employment</u>.

> **Part-Time Employees** – Persons paid on a part-time basis during the designated pay period. <u>Included are those daily or hourly employees</u> usually engaged for less than the regular full-time workweek, as well as any part-time paid officials. (emphasis added.)

*U.S. Census Bureau*, http://www.census.gov/govs/definitions. These definitions do not exclude leased employees like Nurse Hand. To the contrary, the definition of "full-time employees" specifically includes temporary workers. The definition of "part-time employees" specifically include daily and hourly employees. Nurse Hand could qualify as either type of employee depending upon the number of hours worked.

Greenspring then wrongly contends that "within the insurance industry" leased workers are not considered part-time employees. (Brief p. 21). Again, Greenspring fails to cite any legal authority to support this broad and erroneous statement. There is none. As established previously, courts which have been called upon to determine whether the ordinary meaning of the term "employee" or "part-time employee" includes borrowed servants have consistently held that it

should.None of the cases cited by Greenspring addressed this this issue.  (Brief p. 22, n. 5).  Unlike the broadly worded definition used by Greenspring, the policies at issue in those cases included specific language stating that the term "employee" included "leased workers" but not "temporary workers" and specifically defining the latter two terms.  The issue was whether the worker at issue qualified as a "temporary worker" or "leased worker."  *None of these cases discussed whether the "insurance industry" generally considers "employee" to include "leased workers" or "borrowed employees."*  However, to the extent any general understanding can be gleaned from these cases it is this:  Unless an insurer drafts its policy to specifically excludes certain types of workers from its definition of "employee," "leased workers" and "temporary workers" will be included under the ordinary meaning of the term "employee."  *See Maxum Indem. Co. v. New Jersey Iron, Inc.*, 2010 WL 4853644 at *3 (D.N.J. Nov. 22, 2010) (cited by Greenspring and noting that a policy's inclusion of a "leased worker" within the definition of "employee" is consistent with the New Jersey workers' compensation statute's definition of "employee", which includes workers who "perform service for an employer for financial consideration").

In summary, the term "employee" as used in the Greenspring policy unambiguously includes borrowed employees like Nurse Hand, over whom Greenspring concedes that the Hospital had control.  (Brief p. 20).  This Court's

analysis should end here; it need not address any other issue.  If Nurse Hand was

an "employee" of the Hospital when she provided medical services to Ms. Banks,

then she is insured under the Greenspring policy and the policies' "other insurance"

provisions require that Greenspring reimburse Interstate for the full amount of

defense and indemnity expense it incurred in resolving the lawsuit against Nurse

Hand.

## II.  GREENSPRING CANNOT MANUFACTURE AMBIGUITY IN ITS OWN POLICY BY REFERRING TO ITS OWN SUBJECTIVE "REASONABLE EXPECTATIONS."

### A.  The Court should look only to the language of the Greenspring policy, and not extrinsic evidence, to determine whether there is an ambiguity.

Greenspring argues that if the Court does not agree with its interpretation of

the term "employee," then the Court should ignore the language in its policy and

look to certain extrinsic evidence to determine the intended meaning of this term.

In essence, Greenspring urges the Court to look to extrinsic evidence, first, to

create an ambiguity *in the policy it drafted,* and then to resolve the ambiguity in its

favor.  This request is directly contrary to well-settled principles of insurance

contract interpretation.

First, policy language is not ambiguous merely because the parties dispute

its meaning.  *Washington Props., Inc. v. Chin, Inc.*, 760 A.2d 546, 548 (D.C.

2000).  In addition, policy language is not ambiguous simply because its terms are

complex or "could have been clearer." *Garmany v. Mission Ins. Co.*, 785 F.2d 942, 945-946 (11th Cir. 1986) (fact that policy "could have been clearer in setting forth the threshold point for the onset of … coverage … does not mandate the conclusion that the policy was legally ambiguous"). Here, the fact that Greenspring did not expressly refer to "borrowed employees" one way or the other in its definition of "employee" does not render the term "employee" ambiguous.

Second, it is axiomatic that extrinsic evidence of the parties' "reasonable expectations" is not admissible in interpreting an insurance policy *unless and until* it is determined that the language is ambiguous. *See, e.g., Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 190 (D.C. 2009) ("the subjective intent of the parties to a contract is essentially irrelevant. No matter what [the parties] had in mind, the [c]ourt must construe [the parties'] rights on the basis of the contract as written"); *Smalls v. State Farm Mut. Auto. Ins. Co.*, 678 A.2d 32, 35 (D.C. 1996) (because the policy language at issue was "clear and unambiguous" there was no legal basis for considering whether it was consistent with the insured's reasonable expectations); *Sigmund v. Progressive Northern Ins. Co.,* 374 F. Supp. 2d 33, 36-37 (D.D.C. 2005) ("[W]here insurance contract language is not ambiguous, ... 'a written contract duly signed and executed speaks for itself and binds the parties without the necessity of extrinsic evidence.'") (emphasis added); *Whiting v. AARP*,

637 F.3d 355, 361 (D.C. Cir. 2011) (policy interpretation is "not based on any analysis of how [the insured] herself would read the contract.").

Third, a party cannot refer to extrinsic evidence in order to manufacture an ambiguity in policy language that is otherwise unambiguous. *See Conseil Alain Aboudaram, S.A. v. de Groote*, 460 F.3d 46, 50-51 (D.C. Cir. 2006); *Cohan v. Thurston*, 292 S.E.2d 45, 46 (Va. 1982) (extrinsic evidence "cannot be used to first create an ambiguity and then remove it"); *Schneider v. Continental Cas. Co.*, 989 F.2d 728, 731 (4th Cir. 1993) (same).

Under this authority, Greenspring cannot argue that this Court should look to the declarations of Larry Smith and Susan Eckert to determine in the first place if the Greenspring policy is ambiguous. Yet, that is precisely what Greenspring asks this Court to do. This Court should reject Greenspring's invitation and hold that based upon the common and ordinary meaning of the term "employee," and case law holding that this term includes borrowed employees for insurance purposes, Nurse Hand was a covered employee of the Hospital.

**B.    Greenspring's belated evidence of its own subjective intent does not create an issue of fact as to the parties' "reasonable expectations" even if the term "employee" is ambiguous.**

Even if this Court were to conclude that the term "employee" somehow is ambiguous and that Greenspring's "reasonable expectations" are relevant, Greenspring has not provided sufficient evidence to support its interpretation of

34

this term to warrant reversal. Indeed, the only extrinsic evidence offered by Greenspring is in the form of two declarations produced for the first time after the close of discovery and in response to Interstate's motion for summary judgment, one of which is the declaration of Greenspring President Larry Smith.[1] Smith also is the Vice-President of MedStar Health, Inc., the named insured to whom the Greenspring policy was issued. However, for several reasons, Smith's declaration does not create a material issue of fact as to the parties' "reasonable expectations" were as to the meaning of the term "employee."

For example, the reasonable expectations doctrine requires a court to interpret ambiguous provisions consistent with the reasonable expectations of the *purchaser* of the policy. *Travelers Indem. Co. of Illinois v. United Food & Commercial Workers Int'l*, 770 A.2d 978, 986 (D.C. 2001) ("Since insurance contracts are written exclusively by insurers, courts generally interpret any ambiguous provisions in a manner consistent with the reasonable expectations of the purchaser of the policy."). Here, however, there was no "purchaser" of the Greenspring policy. Greenspring is a subsidiary of MedStar and a captive insurer and corporation organized solely for the purpose of insuring the liability of its

---

[1] If this Court determine that these declarations create a fact question on reasonable expectations, this matter must be remanded for the district court's ruling on Interstate's motion to strike these declarations on the grounds that they were untimely. (*See* pages 41-42, *infra*).

35

owner, MedStar.  (Brief p. 24) (citing *Clougherty Packing Co. v. Commissioner*, 811 F.2d 1297, 1298 n. 1 (9th Cir. 1987)).  MedStar, as the owner of Greenspring, therefore does not qualify as a "purchaser" of the Greenspring policy.  As a result, the reasonable expectations doctrine does not apply.

This construction makes sense because the generally recognized purpose of the reasonable expectations doctrine is to protect an insured's reasonable expectations when the policy is written exclusively by the insurer because of the unequal bargaining power between the parties.  *See State v. Signo Trading Intern., Inc.,* 612 A.2d 932, 942 (N.J. 1992) ("Because of the parties' unequal bargaining power, courts have established the doctrine of 'reasonable expectations.'").  Here, it cannot be disputed that MedStar had at least equal bargaining power with Greenspring.  MedStar owns Greenspring, so there is no insured to protect here.

Moreover, to the extent MedStar qualifies as a purchaser of the Greenspring policy, the doctrine still is inapplicable because it only applies to the purchaser/insured's expectations when that party is *seeking coverage* under the policy.  *See Western Exterminating Co. v. Hartford Acc. and Indem. Co.,* 479 A.2d 872, 877 (D.C.1984) (finding that if the policy is ambiguous, then the reasonable expectations of the insured seeking coverage should guide an interpretation of the policy).  Here, MedStar is not seeking coverage and is not even a party to this appeal.  Similarly, the Hospital is not seeking coverage under the policy and is also

36

not a party to this appeal. Greenspring, the captive insurer and only party to the appeal apart from Interstate, is obviously not seeking to establish coverage.

If, however, this Court determines that Greenspring, as the insurer who drafted the insurance policy at issue, is somehow entitled to assert the "reasonable expectations" doctrine, this argument still must fail. D.C. courts apply an *objective* standard to the insured's reasonable expectations. *See Keene Corp. v. Insurance Co. of North America*, 667 F.2d 1034, 164 fn. 12 (D.C. Cir. 1981) ("[We] explicitly base our interpretation of these policies on the expectations that [the insured] could have reasonably formed, as an objective matter, on the basis of the policies' language."); *Redmond v. State Farm Ins. Co.,* 728 A.2d 1201 (D.C. 1999) ("if the policy were ambiguous, then the objective reasonable expectations of [the insured] should guide an interpretation of the insurance contract.").

Greenspring completely disregards the objective standard by relying on the self-serving and belated declaration of Smith. (Brief p. 25). Smith is both the President of Greenspring and Vice President of MedStar. (J.A. 603). His statement upon which Greenspring relies speaks solely to the purported subjective intent of Greenspring and Medstar and reads as follows: "it was the understanding of both Greenspring and MedStar that the Greenspring Policy would provide coverage to only those employee that it, or its member entities (like the Hospital), had hired, but not to temporary workers such as agency nurses." (J.A.603). As a

threshold matter, this declaration is completely irrelevant because, for the reasons stated above, only the reasonable expectations of the insured seeking coverage should govern the analysis. It is undisputed that Greenspring and MedStar are not seeking coverage.

Moreover, Smith's declaration contains only self-serving and conclusory statements concerning the subjective intent of MedStar and Greenspring and, thus, has no bearing on the objective reasonable expectations of an insured. The law in the District of Columbia is that affidavits which are self-serving and merely conclusory do not create a genuine issue of fact. *Bonieskie v. Mukasey*, 540 F. Supp. 2d 190, 194 (D.D.C. 2008) ("Summary judgment for a defendant is most likely when a plaintiff's claim is supported solely by the plaintiff's own self-serving, conclusory statements."); *Fields v. Office of Johnson*, 520 F. Supp. 2d 101, 105 (D.D.C. 2007) ("[s]elf-serving testimony does not create genuine issues of material fact"). Greenspring has not produced any specific facts to corroborate Smith's declaration. The declaration is also completely devoid of references to any supporting documentation. The statement does not create a genuine issue of material fact for these reasons as well. *Fields v. Office of Johnson*, 520 F. Supp. 2d 101, 105 (D.D.C. 2007) ("Self-serving testimony does not create genuine issues of material fact, especially where that very testimony suggests that corroborating evidence should be readily available."); *Gen. Elec. Co. v. Jackson*, 595 F. Supp. 2d

38

8, 36 (D.D.C. 2009) (a "self-serving and uncorroborated" declaration is "of little value at the summary judgment stage").

Greenspring also submitted for the first time in opposition to Interstate's motion for summary judgment the declaration of Susan Eckert, Senior Vice President of the Hospital.   Greenspring does not expressly refer to Eckert's declaration in support of its appeal.   However, the declaration does not constitute competent evidence concerning the Hospital's intent concerning insurance coverage from Greenspring because Eckert readily conceded in her deposition that she had absolutely no involvement in these issues.  (J.A. 525-26).   Greenspring's citation to Eckert's deposition testimony is misleading.  (Brief, p. 25).  An accurate reading of the cited pages reveals that Eckert never purported to testify as to the Hospital's "intent" or "expectation" as to coverage for borrowed employees, she only testified that her job was to see that language requested by the legal department at the Hospital was included in staffing contracts.  (J.A. 525-26).

Greenspring wrongly argues that Nurse Hand also had no expectations of coverage, even claiming that she testified in deposition that she did not consider herself to be an "employee" of the Hospital.  (Brief  p. 26).  This is simply not true. The deposition to which Greenspring cites was taken in the underlying malpractice lawsuit, not in this lawsuit.  (J.A. 570-72).  In addition, a review of the pages cited by Greenspring readily reveals that Hand was never asked whether she considered

herself an "employee" of the Hospital for purposes of insurance coverage, let alone whether she would have expected the Hospital to provide her coverage if she were sued for malpractice relating to the care she provided to one of the Hospital's patients. (*Id.*) This Court should disregard Greenspring's mis-characterization of the record.

Lastly, Greenspring cites to the Temporary Staffing Agreement in an effort to manufacture a question of fact, wrongly arguing that the Agreement specifies that agency nurses are employees of Progressive for all purposes. (Brief p. 4). To the contrary, the Agreement states only that for purposes of "non-competition" and to ensure that Progressive is paid a fee for any agency nurse the Hospital may wish to hire on a permanent basis, agency nurses will remain Progressive employees until the Hospital has complied with the procedures outlined in the Agreement. (J.A. 47, 53). Nowhere does the Agreement state that for purposes of liability insurance, agency nurses will not be considered employees of the Hospital. This language easily could have been included in the Agreement. It was not. More saliently, courts have consistently *rejected* the argument that the determination of whether someone is an "employee" for purposes of liability and insurance coverage should be controlled by the parties' characterization of that relationship in an underlying contract. *See, e.g., Anthony v. Okie Dokie*, 976 A.2d 901 (D.C. 2009).

In summary, Greenspring has presented no evidence to create a material issue of fact as to "reasonable expectations." If this Court determines that the term "employee" is ambiguous, this ambiguity must be construed in favor of coverage for Nurse Hand, and the district court's ruling affirmed. *See Cameron v. USAA Prop. & Cas. Ins. Co.,* 733 A.2d 965, 968 (D.C. 1999) ("In this jurisdiction, as elsewhere, it has long been 'a general rule of construction of policies of insurance ... that any reasonable doubt which may arise as to the meaning or intent of a condition thereof, will be resolved against the insurer.'") (citations omitted); *Harbor Ins. Co. v. Omni Constr., Inc.*, 912 F.2d 1520, 1522 (D.C. Cir. 1990) ("Any ambiguity in an insurance contract must be construed in favor of the insured.'") (citations omitted).

However, if this Court finds that the declarations of Smith or Eckert could create an issue of material fact as to "reasonable expectations," then this matter should be remanded for a ruling on Interstate's motion to strike those declarations. Greenspring did not raise the "reasonable expectations" defense or identify any witness to testify on this issue during discovery, nor did it raise this argument in its own opening motion for summary judgment. On the contrary, Greenspring maintained in its opening motion that the term "employee" was *unambiguous* based upon the ordinary meaning of this term. Not until Greenspring filed its opposition to Interstate's motion, and only after the close of discovery, did

41

Greenspring argue for the first time that its own policy language may be ambiguous. Greenspring produced with its response the declaration from Larry Smith purporting to set forth the expectations of both Greenspring and Medstar in an attempt to resolve that claimed ambiguity.

Interstate promptly moved to strike these declarations. (J.A. 608). Interstate explained they were untimely, but that if the district court allowed them as evidence, and determined that they somehow created a material issue of fact, Interstate requested the right to cross-examine these witnesses and conduct further discovery. (*See* Interstate's Memorandum in Support of its Motion to Strike the Declarations of Susan Eckert and Larry Smith, pp. 15-16). The district court ultimately denied this motion as moot in light of its ruling that it did not consider these affidavits because the term "employee" was unambiguous. (J.A. 647). If this Court were to determine that that ambiguity exists, and that the extrinsic evidence proffered by Greenspring creates a material issue of fact, then this matter must be remanded to the district court for a ruling on Interstate's motion to strike. However, because the only evidence offered by Greenspring does not create a material issue of fact as to reasonable expectations, remand is not necessary.

42

### III.   INTERSTATE IS ENTITLED TO EQUITABLE CONTRIBUTION FROM GREENSPRING FOR THE MONIES IT PAID TO SETTLE THE LAWSUIT AGAINST NURSE HAND.

#### A.   The Greenspring policy provides primary coverage to Nurse Hand and the Interstate policy provides only excess coverage.

Contribution is an equitable remedy grounded in the precept that a party who discharges a liability that is owed by another is entitled to be reimbursed by that party.  *See, e.g., Green Leaves Restaurant, Inc. v. 617 H Street Associates*, 974 A.2d 222 (D.C. 2009).  When an insured like Nurse Hand is entitled to "dual coverage" under two different policies, District of Columbia courts will look to the terms of the "other insurance" provisions in the policies in order to determine whether one insurer has paid on behalf of a common insured what should have been paid by the other insurer.  *Jones v. Medox, Inc.,* 430 A.2d 488, 493-94 (D.C. 1981) ("the rule in the District of Columbia" is that when there are two applicable insurance policies, the court will analyze the policies' "other insurance" clauses to determine priority of coverage); *Continental Cas. Co. v. Hartford Fire Ins. Co.*, 116 F.3d 932, 939-40 (D.C. Cir. 1997) (one insurer's liability for contribution to another insurer that also provided coverage for the same loss would depend upon reconciliation of the "other insurance" provisions); *Keene Corp. v. Ins. Co. of North America*, 667 F.2d 1034, 1050 (D.C. Cir. 1981) ("[w]hen more than one policy applies to a loss, the 'other insurance' provisions of each policy provide a scheme by which the insurers' liability is to be apportioned").

43

The type of inequity that courts seek to correct through equitable contribution is the inequity that results when the express terms of the "other insurance" provisions in two applicable policies require one insurer to pay before the other insurer is obligated to pay, but the obligated insurer refuses to satisfy its obligation.  Greenspring ignores this fundamental inequity and unsuccessfully argues that the Court should consider which insurer was paid the most premium, etc.  (Brief, pp. 38-40).  Even if Greenspring had produced any competent evidence to support these alleged inequities, which it has not, this is simply not the type of inequity that gives rise to a claim for equitable contribution.  Because Interstate's policy clearly stated that it would provide only excess coverage, Interstate most likely charged Progressive a much lower premium than if it had agreed to provide primary coverage and, therefore, there is no inequity based on the premium issue upon which Greenspring speculates.

In analyzing "other insurance" clauses, District of Columbia courts will attempt to reconcile the language of the clauses in order to give effect to the intent of these provisions.  *Jones v. Medox, Inc.*, 430 A.2d 488, 493-94 (D.C. 1981).  When the "other insurance" provisions in two policies are mutually repugnant, for example, when both purport to provide "excess" insurance, courts have developed special rules such as the "equal shares" rule in order to resolve these conflicts.  However, when the policies' "other insurance" provisions can easily be reconciled

based upon their plain language, these provisions will be applied as written. *Id.* Here, the "other insurance" in the Greenspring policy specifically states that "with respect to coverage afforded by this policy as it may apply to **Employees**, this insurance is designated as primary". (J.A. 408-09) (emphasis in original). The Interstate policies unequivocally state that they provide "excess insurance" over and above the limits of any other available insurance. (J.A. 450, 479).

Significantly, Greenspring does not dispute that based upon a comparison of the "other insurance" provisions in the Greenspring policy and Interstate's policies, the Greenspring policy provides "primary" coverage for covered employees, while the Interstate policies only provide "excess" coverage. Given that the limit of liability coverage available under the Greenspring policy is in excess of the $3,055,000.00 paid by Interstate, Greenspring must reimburse the entire amount to Interstate. The district court correctly held that pursuant to the doctrine of equitable contribution, Greenspring is obligated to reimburse Interstate this full amount plus the defense costs incurred by Interstate in defending Nurse Hand. *See Keene Corp. v. Ins. Co. of North America*, 667 F.2d 1034, 1050, 215 U.S. App. D.C. 156 (D.C. Cir. 1981) (an insurer is entitled to seek reimbursement of defense costs from other insurers "under the 'other insurance' clauses or under the doctrine of equitable contribution").

**B.    Any contractual indemnity obligations that may have existed between the Hospital and Progressive are irrelevant in determining priority of coverage under the two insurance policies.**

Greenspring attempts to avoid the plain language in its own policy that requires Greenspring to provide primary coverage to Nurse Hand by urging this Court to make new law in the District of Columbia and adopt the Eighth Circuit's holding in *Wal-Mart Stores, Inc. v. RLI Ins. Co.*, 292 F.3d 583 (8th Cir. 2002). Pursuant to the *Wal-Mart* rule, courts will look to underlying contractual indemnity obligations between the insureds to determine priority of coverage rather than the "other insurance" provisions in certain circumstances. This Court should reject Greenspring's invitation to ignore the plain language of its policy for several reasons. First, it should follow the Fourth Circuit, which categorically rejected the *Wal-Mart* rule under Maryland law. *See Travelers Property Cas. Co. of America v. Liberty Mut. Ins. Co.*, 444 F.3d 217 (4th Cir. 2006). Maryland is the source of the District's common law and is an "especially persuasive authority when the District's common law is silent." *Napolean v. Heard*, 455 A.2d 901, 903 (D.C. 1983); *Sigmund v. Progressive Northern Ins. Co.*, 374 F. Supp. 2d 33, 36 (D.C. Cir. 1980) ("the District of Columbia courts should look to the law of Maryland for guidance …"); *TMG II v. United States*, 1 F.3d 36, 41 (D.C. Cir. 1993) (same).

*Travelers Property Cas. Co. of America v. Liberty Mut. Ins. Co.*, 444 F.3d 217 (4th Cir. 2006), applying Maryland law, is directly on point and mandates that

rejection of Greenspring's invitation to ignore the plain language of the "other insurance" provisions in determining priority of coverage. Ryland was a real estate management company (insured by Travelers) retained by State Street Bank (insured by Liberty) to manage a residential duplex owned by State Street. Liberty's policy also covered Ryland as an "additional insured" based upon Ryland's status as a real estate manager. *Id.* at 224. Travelers brought a contribution action against Liberty seeking contribution for the defense and indemnity expenses it incurred in defending Ryland in a premises liability action brought by an injured tenant against Ryland and State Street. *Id.* at 219. Liberty argued that allowing Ryland to recover "would result in circular litigation, since Liberty Mutual could then seek recovery from Ryland based on a subrogation claim arising from Ryland's agreement to indemnify State Street." *Id.* at 224. Liberty went on to argue that, "ultimately, Travelers, as Ryland's insurer, would have to pay for the cost of the underlying action." *Id.* The district court denied Travelers' contribution claim stating that "because the management contract between Ryland and State Street provided that Ryland would indemnify State Street for liability arising from Ryland's activities, State Street 'has not undertaken any obligation to insure Ryland's actions." *Id.*

The Fourth Circuit (applying Maryland law) reversed and held that Liberty's argument improperly blurred the distinction between the insurance contracts and

47

the underlying indemnity contracts. The Fourth Circuit refused to apply the *Wal-Mart* rule to the facts before it:

> The principles of [*St. Paul Fire and Marine Ins. Co. v. American International Specialty Lines Ins. Co.*, 365 F.3d 263 (4th Cir. 2004) (relying upon *Wal-Mart*], however, are not relevant to the case before us. The issue here is coverage for *only* Ryland's liability. Travelers concededly insured Ryland, and because of Liberty Mutual's insuring language, it must also insure Ryland through its additional insureds clause. <u>This is not a case where we are determining State Street's liability vis-à-vis Ryland's.</u> <u>The fact that Ryland agreed to indemnify State Street under the [management contract] does not absolve Liberty Mutual of its independent contractual obligation to insure Ryland as State Street's "real estate manager."</u> If the issue in this case turned on the underlying liability as between Ryland and State Street, we would likely conclude, as Liberty Mutual urges, that Ryland bore full responsibility because of its indemnification agreement. But even then, having determined that Ryland had legal responsibility for [plaintiff's] injuries, we would still have to determine who insured that liability. In this case Travelers concededly provided coverage, as it issued a policy directly to Ryland as the named insured. <u>But Liberty Mutual, which issued a policy to State Street as its named insured, also provided coverage to additional insureds, not because of any indemnity clause running in favor of its insured State Street but because of its independent undertaking to Ryland</u>. (Emphasis added.)

444 F.3d at 224-25. Accordingly, based upon the terms of the policies' "other insurance" clauses, the court held that the two insurers were obligated to share in the defense and indemnity of Ryland regardless of what the underlying indemnity obligations between the insureds would require. *Id. See also* Joseph Lavitt, *Abjuring the Collateral Indemnity Exception to Insurer Contribution*, 56 Wayne L. Rev. 1333, 1352-53 (citing *Travelers Property* as an example of a jurisdiction that has "reject[ed] the [*Wal-Mart*] rationale entirely").

Although some courts in other jurisdictions have applied the *Wal-Mart* rule, even in those jurisdictions, the rule is typically applied only when there are "live" indemnity obligations being litigated between the insureds that could, at least in theory, create "circular litigation". For example, Greenspring relies upon *St. Paul Fire & Marine Ins. Co. v. Am. Int'l Specialty Lines Ins. Co.*, 365 F.3d 263, 270-72 (4th Cir. 2004) as an example of a Fourth Circuit opinion applying *Wal-Mart*. (Brief pp. 30-31). This opinion is of no import here because, among other things, it predicts the law of Virginia and not the law of Maryland or D.C. In addition, *St. Paul* involved circumstances in which there were in fact "live" indemnity obligations between the insureds and potential indemnity claims that had not been released, a situation that does not exist here. Here, all parties to the underlying lawsuit, including the Hospital and Progressive, agreed to release any contractual indemnity obligations amongst themselves. The only exception to the global settlement was that Interstate alone could seek to re-allocate the monies it paid on behalf of Nurse Hand pursuant to the policies' "other insurance" provisions.(J.A. 369).

Even if there were "live" indemnity obligations between the parties, Interstate disputes that that Temporary Staffing Agreement would require Progressive to indemnify the Hospital. The Agreement states only that the Hospital and Progressive will indemnify each other for negligence of their

respective employees.    Because Nurse Hand was working as the Hospital's borrowed employee, these provisions require the Hospital to indemnify Progressive.  (J.A. 53).  These indemnity provisions also do not require that any coverage provided by Progressive must be primary over the Hospital's coverage, although the Agreement easily could have so provided if that were the parties' intent.

Maryland is not the only jurisdiction that has rejected *Wal-Mart*.   For example, in *National Union Fire Ins. Co. of Pittsburgh, PA v. NGM Ins. Co.,* 2011 WL 6415484 (D.N.H.  Dec. 21, 2011) (New Hampshire law) the court refused to apply *Wal-Mart* in determining the priority of coverage between two insurance policies, one of which provided primary insurance pursuant to its "other insurance" clause, the other of which provided "excess" coverage.  The insurer who provided primary coverage urged the court to look to the underlying indemnity obligations between the insureds to essentially override the priority of coverage established by these "other insurance" provisions.  *Id.* at *6.  The court refused to adopt *Wal-Mart* "in the absence of a developed argument as to whether the New Hampshire Supreme Court would adopt" the rule.  *Id.* at *10.  Even if *Wal-Mart* were adopted, it still would not apply because there was no conflict between the policies "other insurance" provisions:

> Courts refer to indemnification agreements to determine the parties' intent when the applicable other-insurance provisions conflict, that is

50

> when each policy 'provides primary coverage to the same insured in respect to the claim in question and contains mutually consistent 'other insurance' provisions. …  *Am. Indem. Lloyds v. Travelers Prop. & Cas. Ins. Co.*, 335 F.3d 429, 435-36 (5th Cir. 2003); *see also Wal-Mart Stores*, 292 F.3d at 587-88.

*Id.  See also National Union Fire Ins. Co. of Pittsburg, P.A. v. Hartford Ins. Co. of Midwest,* 248 A.D.2d 78, 84 (N.Y. App. Div. 1998), *aff'd* 93 N.Y.2d 983 (N.Y. 1999) (insurer's obligation to provide coverage "is determined by the policies and not subcontracts; therefore, an indemnification provision [does] not cancel out policies' other insurance clauses"); *USF&G Co. v. CNA Ins. Cos.,* 208 A.D.2d 1163, 1165 (N.Y. App. Div. 1994) (rejecting argument that "other insurance" clauses were nullified because sub-contract between insureds required complete indemnification by one party to the other party and refusing to rewrite the plain and unambiguous language of the insurance policies).

As the federal court aptly observed in *NGM Ins. Co., supra*, even in jurisdictions that have adopted *Wal-Mart*, courts will only resort to this rule when the "other insurance" clauses are identical and, therefore, mutually repugnant.  For example, when two policies purported to provide primary coverage or both purported to provide excess coverage.  *See, e.g., Am. Indem. Lloyds v. Travelers Prop. & Cas. Ins. Co.,* 335 F.3d 429, 432, 435-36 (5th Cir. 2003) (cited by Greenspring) (applying *Wal-Mart* when two policies contained "identical 'other insurance' clauses").  The *Wal-Mart* rule would not apply here because the "other

insurance" provisions in the Greenspring policy and Interstate's policies do not conflict.

Several courts in California also have recognized this limited application of the *Wal-Mart* rule. This is significant because *Wal-Mart* relied heavily upon the reasoning of the California court in *Rossmoor Sanitation, Inc. v. Pylon, Inc.*, 532 P.2d 97 (Cal. 1975). For example, in *Travelers Cas. & Surety Co. v. Am. Equity Ins. Co.*, 113 Cal. Rptr. 2d 613, 624 (Cal. Ct. App. 2002), the court specifically held that *Rossmoor* was not applicable in an equitable contribution action between two insurers. In *JPI Westcoast Construction, L.P. v. RJS & Associates, Inc.,* 68 Cal. Rptr. 3d 91, 101 (Cal. Ct. App. 2007), the court confirmed that *Rossmoor* "did not purport to establish a general rule that a contractual indemnification agreement between an insured and a third party takes precedence over well-established general rules of primary and excess coverage in an action between insurers." *See also Hartford Cas. Ins. Co. v. Mt. Hawley Ins. Co.*, 20 Cal. Rptr. 3d 128 (Cal. Ct. App. 2004) ("This is not to say that, under *Rossmoor*, an indemnity agreement always prevails over provisions in an insurance policy, as for example where there are two levels of insurance coverage, primary and excess.")

Greenspring incorrectly cites to what it says is a "long line of cases" supporting application of *Wal-Mart* in this case. (Brief pp. 30-34). Besides the fact that none apply D.C. or Maryland law, none of these cases assist Greenspring.

For example, *American Fidelity & Cas. Co. v. Simmons*, 253 F.3d 634 (4th Cir. 1958) (applying North Carolina law) and *J. Walters Construction, Inc. v. Gilman Paper Co.*, 620 So.2d 219 (Fla. Ct. App. 1993) (applying Florida law) did not involve a claim for equitable contribution between two insurers of a common insured, but rather, the entirely separate issue as to when an insurer can assert a direct claim for subrogation against a responsible party. *Chubb Ins. Co. of Canada v. Mid-Continent Cas. Co.*, 982 F. Supp. 435, 437 (S.D. Miss. 1997), involved two insurance policies with identical, mutually repugnant "other insurance" clauses. *Interstate Fire & Cas. Co. v. Auto-Owners Ins. Co.*, 433 N.W.2d 82 (Minn. 1988) involved the issue of whether a second-layer true excess policy should be triggered before all underlying primary policies are exhausted, i.e., vertical vs. horizontal exhaustion, which is not the issue here. *Aetna Ins. Co. v. Fidelity & Cas. Co. of New York*, 483 F.2d 471 (5th Cir. 1973) pre-dates *Rossmoor* and *Wal-Mart* and does not even state what the policies' "other insurance" provisions provided.

Simply put, there is no reason to disregard the plain language of the policies "other insurance" provisions and apply *Wal-Mart* here because there is no conflict between these "other insurance" provisions. Even Greenspring concedes that, if coverage exists, the Greenspring policy provides primary coverage and the Interstate policy provides only excess coverage. Because the Greenspring policy

53

includes limits sufficient to pay for the entire amount of indemnity and defense costs paid on behalf of Nurse Hand, the Interstate policy is not triggered.

**C.    Greenspring is obligated to reimburse Interstate for the full amount of defense and settlement amounts paid by Interstate.**

The district court correctly ruled that Greenspring waived the right to argue that it should not be liable for the full amount of defense and indemnity incurred by Interstate but only an unspecified portion of that amount. (J.A. 950). The district court's finding of waiver was based upon Greenspring's failure to assert this argument until after the district court had granted summary judgment in Interstate's favor. (J.A. 950). The district court's ruling on this issue is subject to an abuse of discretion standard of review. *See Bristol Petroleum Corp. v. Harris*, 901 F.2d 165, 284 (D.C. Cir. 1990); *Bridges v. Clark*, 59 A.3d 978 (D.C. 2013). The factual basis supporting waiver is overwhelming.

Interstate sought a determination that pursuant to the policies' "other insurance" clauses, Greenspring was obligated to reimburse Interstate the full amount of the $3,055,000 Interstate paid to settle the malpractice claims against Nurse Hand. The district court correctly set forth the facts that are "undisputed by defendants", one of which is that as part of the settlement, Interstate "paid $3,055,000 on behalf of Nurse Hand." (J.A. 650). The district court correctly acknowledged that, from the start, the essence of this lawsuit was that Interstate sought "reallocation of a settlement paid by plaintiff [Interstate] for the alleged

malpractice of Nurse Chichio Hand," who was insured by Greenspring on a primary basis and by Interstate on an excess basis. (J.A. 944). The district court correctly explained that Interstate sought "a declaration that Nurse Hand is an insured of Greenspring and that Greenspring is required to reimburse Interstate for the [full] $3,055,000 that Interstate paid on behalf of Nurse Hand in the underlying litigation." (J.A. 650-51).

However, in briefing cross-motions for summary judgment, Greenspring never argued that Interstate was required to prove what portion of the $3,055,000 was paid on behalf of Nurse Hand or that Greenspring could only be liable for a portion of the $3,055,000. Instead, Greenspring argued it was not liable for this payment because Nurse Hand was only a "borrowed servant" of the Hospital, and did not qualify as an insured "employee" under the Greenspring policy. Nowhere in its briefs did Greenspring ever dispute that, *if* it were determined Nurse Hand was an employee of the Hospital and that Greenspring was therefore responsible for providing primary insurance coverage to Nurse Hand, there would then be an issue of fact as to how much of the $3,055,000 Greenspring would owe.

Not until *after* the district court granted Interstate's motion for summary judgment did Greenspring argue for the first time in its "position statement" concerning damages that Interstate still had to prove how much of this settlement amount was paid to settle the claims against Nurse Hand as opposed to the

vicarious liability claim against her employer Progressive, who also was an insured under the Interstate excess policy. The district court correctly ruled that Interstate had met its burden in establishing its damages with reasonable certainty and that Greenspring had waived its rights to assert this belated "apportionment" argument. (J.A. 944-954). *See, e.g., Noble Energy, Inc. v. Salazar*, 691 F. Supp. 2d 14, 23 n. 6 (D.D.C. 2010) (argument not raised by a party in their summary judgment briefing is waived). The district court did not abuse its discretion and this Court should affirm.

Even if this Court were to determine that the district court abused its discretion in rejecting this argument as untimely, Greenspring has produced no evidence to support a reduced payment to Interstate. Greenspring incorrectly claims that it cannot be liable for the full amount because (1) Progressive also was released as a result of the settlement and Progressive is not insured under the Greenspring policy; and (2) some unspecified amount of the monies paid to the plaintiff "must have been" to release the Hospital's indemnity claim against Progressive. Both arguments miss the mark.

As the district court concluded, and as Greenspring conceded during the summary judgment briefing, the $3,050,000 payment was made by Interstate to settle the malpractice claim against Nurse Hand. This entire payment was made to the plaintiff to settle her claim against Nurse Hand. Although this payment also

resulted in a release of the incidental claim against Progressive, the only claim asserted against Progressive was one for vicarious liability and indemnity based upon the alleged malpractice of Nurse Hand.  Significantly, there were no independent negligence claims asserted against Progressive for negligent hiring or negligent supervision, for example, which might have necessitated discovery and/or defense beyond simply defending the alleged malpractice of Nurse Hand in caring for Radianne Banks.  The claims against Hand and Progressive were based upon the same facts (Hand's alleged malpractice) and sought the same damages. The entire lawsuit against Progressive hinged on the success of the malpractice claim against Nurse Hand.  If malpractice were established, then Progressive was vicariously liable for Hand's negligence.  If malpractice were not established, there was no claim against Nurse Hand and no claim against Progressive.  The monies paid by Interstate were paid as the result of Nurse Hand's alleged malpractice.

Greenspring unpersuasively argues that because the Hospital's underlying contribution/indemnity claims against Nurse Hand and Progressive also were released as a result of the global settlement agreement with Radianne Banks that some unspecified portion of the $3,055,000 indemnity payment made by Interstate to Banks must have been for a claim unrelated to Nurse Hand's alleged malpractice.  What Greenspring fails to comprehend is that none of the $3,055,000 paid by Interstate was paid to the Hospital.  The entire amount was paid to Banks.

57

The sole purpose of the Hospital's contribution/indemnity claim against Nurse Hand and Progressive was to ensure that Hand and Progressive (as opposed to the Hospital) paid for the alleged malpractice of Hand.  The fact that this claim also was dismissed as part of the global settlement does not mean that monies were paid for that claim.  In addition, Progressive also dismissed its indemnity claim against the Hospital as part of the settlement.  A more likely scenario is that these indemnity claims "canceled each other out".  Greenspring paid monies to release the claims against the Hospital and its doctors while Interstate paid monies to release the claim against Nurse Hand.  Greenspring's argument is pure speculation and should be rejected outright.

As the district court correctly observed, to the extent the Hospital and/or Greenspring believed any portion of the $3,055,000 paid by Interstate should have been separately allocated to their vicarious liability/indemnity claim against Progressive, they were obligated to request that this allocation be made at the time of settlement and included in the settlement agreement.  (J.A. 951-52).  This is particularly true given that the Hospital and Greenspring specifically acknowledged in the settlement agreement that Interstate would be pursuing an action for contribution against Greenspring for the amount it paid.  Neither the Hospital nor Greenspring included a provision preserving its right to offset that

amount based upon its contractual indemnity claims. (J.A. 952). They are not entitled to ask this Court to effectively re-write their settlement agreement.

It is well-settled that if a settlement agreement does *not* allocate indemnity payments between certain claims, allocation of the judgment or settlement is appropriate only when there is a reasonable means of doing so. When, as here, all settled claims were based upon the same core facts and same damages, allocation is not possible, and the insurer is obligated to pay for the entire settlement. *See, e.g., Feature Realty Litigation*, 634 F. Supp. 2d 1163, 1172-73 (E.D. Wash. 2007) (allocation of settlement amount between covered and non-covered claims not appropriate when the claims are based upon the same factual core and produced the same damages); *Alexander v. CNA Ins., Co.,* 657 A.2d 1282, 1285 (Pa. Super. Ct. 1995) (policyholder was entitled to indemnity for entire settlement amount paid to settle a claim seeking the same damages under alternative covered tort and non-covered breach of contract counts).

Here, the underlying plaintiff sought damages in the underlying lawsuit for a single harm – physical injuries allegedly caused by Nurse Hand and the doctors employed by the Hospital. Ms. Banks did not assert distinct claims that gave rise to distinct damages. The claimed injuries and damages were all the result of the alleged malpractice of Nurse Hand and the Hospital's doctors. Interstate paid Ms. Banks $3,055,000 to settle the claim against Nurse Hand (and the incidental

vicarious liability against Progressive). Greenspring paid Ms. Banks $1,055,000 to settle the claim against its doctors. However, because Greenspring – and not Interstate – was the primary insurer for Nurse Hand's negligence, Greenspring is obligated to reimburse the full $3,055,000 to Interstate.

## CONCLUSION

Interstate requests that this Court affirm the district court's grant of summary judgment in Interstate's favor and its denial of Greenspring's motion for summary judgment. Interstate is entitled to judgment against Greenspring for the following amounts: (1) $3,055,000.00, the monies Interstate paid to plaintiff Banks; (2) pre-judgment interest on $3,055,000.00 at the rate of 6.00% (not compounded) from August 20, 2009 (the date Interstate made this payment) through the date of final judgment entered by the district court on January 18, 2013; (3) attorneys' fees and costs totaling $153,248.72 incurred by Interstate in defending Nurse Hand.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Fed. R. App. P. 34(a), Interstate requests that oral argument be permitted in light of the multiple issues and sub-issues involved. Interstate also requests oral argument so that it has the opportunity to address any new authority or arguments made in Greenspring's reply brief.

Respectfully submitted


/s/ Paulette S. Sarp
Paulette S. Sarp (#351453)
HINSHAW & CULBERTSON LLP
333 South Seventh Street
Suite 2000
Minneapolis, MN 55402
Tel: 612-333-3434 / Fax: 612-334-8888

David Hudgins (#32072)
dhudgins@hudginslawfirm.com
Hudgins Law Firm
515 King Street, Suite 400
Alexandria, VA  22314
703-739-3300

Attorneys for Appellee Interstate Fire
and Casualty Company

## **CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because, according to the word processing software employed by my firm, it contains 13,982 words.

/s/ Paulette S. Sarp
_Paulette S. Sarp, #351453_

## **CERTIFICATE OF SERVICE**

I, Paulette S. Sarp, hereby certify that two true and accurate copies of the foregoing brief were served upon counsel for the Appellee by first class mail on this 10th day of October, 2013, as follows:

Linda S. Woolf, Esq.
Joseph B. Wolf, Esq.
Goodell, DeVries, Leech & Dann, LLP
One South Street, 20th Floor
Baltimore, Maryland  21202

_Attorneys for Appellant_

/s/ Paulette S. Sarp
_Paulette S. Sarp, #351453_